**UNITED STATES of America,**

v.

**James R. MILLIO, Defendant.**

**No. CR–84–22.**

United States District Court,
W.D. New York.

June 13, 1984.

Salvatore R. Martoche, U.S. Atty., Buffalo, N.Y. (Anthony M. Bruce, Dept. of Justice Atty., Buffalo, N.Y., of counsel), for U.S.A.

Jones, Casey & Amigone, Buffalo, N.Y. (Thomas J. Casey, Buffalo, N.Y., of counsel), for defendant James R. Millio.

CURTIN, Chief Judge.

The defendant in this case is charged with unlawful possession of a firearm in violation of 18 U.S.C.App. § 1202(a)(1). He now moves to suppress the Browning 9

mm. automatic pistol which was seized from a car he was driving on February 2, 1984. A suppression hearing has been held, and the court heard final arguments of counsel on May 9, 1984. The following are the court's findings of fact and conclusions of law.

There is one aspect to this motion which makes this case an unusual one. The government and the defendant have entered into a stipulation concerning the circumstances surrounding the seizure of the weapon.

[The government and the defendant] stipulate and agree that the search that is the subject of this hearing was a pretext search. That is to say, the police officers lacked probable cause to search, either with a warrant or without a warrant. Thus surveillances were instituted to determine if the Defendant could objectively be stopped for a traffic violation.

[Stipulation dated March 2, 1984.] This stipulation, together with the hearing testimony, clearly indicates that the government's aim was to develop information which would provide a sufficient basis for stopping the defendant's car and then recovering a weapon which was suspected to have been in his possession.

At approximately 11:45 a.m. on February 2, 1984, F.B.I. Special Agent Glen C. Reukauf went into the Royal Pheasant Restaurant in Buffalo, New York, accompanied by Special Agent Mary Lord. The two agents were conducting a surveillance of James Millio, because they suspected that he was in possession of a weapon. Millio was seen at the bar area of the restaurant about 25 feet from the table where Agents Reukauf and Lord took their places. Reukauf saw Millio standing at the bar with one other person. On the bar in front of Millio was a partially filled glass which contained a colorless beverage which Reukauf believed was either gin or vodka. Approximately ten minutes after Reukauf arrived, Millio left the bar for about ten minutes. Reukauf did not recall whether he saw Millio actually consume any of the liquid that was in his glass before leaving the bar on this occasion. [Tr. at 75–80.]

Agent Reukauf was not able to observe Millio during his short absence. Instead, Reukauf called the State Police and said that he spotted Millio in a bar and that he was drinking. He also informed the police that Millio's car was parked outside. Reukauf had seen the car before entering the Royal Pheasant. [Tr. at 83.]

Agent Reukauf returned to his table, and Millio eventually returned to his place at the bar. Reukauf at one point observed a person working behind the bar pour a drink for Millio from what appeared to be a bottle containing gin or vodka. [Tr. at 80.] Millio was in Agent Reukauf's view almost continuously until Millio left at approximately 12:15 p.m. During this time, Reukauf saw Millio actually drinking and saw one round of drinks being ordered. [Tr. at 79.]

Agent Reukauf called the State Police for a second time as Millio left the restaurant. Reukauf then reported that Millio had been in the restaurant for two hours, that he had been drinking, and that he was now leaving. [Tr. at 85.]

At about 12 p.m., Trooper Thomas Paluch of the State Police was patrolling in the Boston, New York area, several miles from Buffalo, when he received a radio message ordering him to call the Boston station. When he called, he was ordered to meet with Investigators Furman and Bigelow at the State Police Barracks in Cheektowage, New York. By the time Paluch arrived, Furman and Bigelow had left. Trooper Paul Hennessey was there to inform Paluch that he and Paluch were to drive into Buffalo to meet Furman and Bigelow. He also told Paluch that their assignment was to stop a certain vehicle whose driver was possibly armed and had possibly been drinking. The troopers drove into Buffalo and parked about a half-mile from the Royal Pheasant [Tr. at 7–8.]

Troopers Paluch and Hennessey were soon notified by Furman and Bigelow that Millio had entered his small red automobile. The two troopers spotted the car and fol-

lowed it. They lost contact with the car for ten minutes before relocating it and then pursued it down Richmond Avenue. There were four cars between their marked State Police vehicle and Millio's car. Paluch estimated that Millio was driving at a speed of 20 miles per hour. Paluch also noted that Millio made "three sharp turning motions within his lane of traffic." [Tr. at 14.] The low speed at which Millio was operating his vehicle and the weaving, together with the information that he had been drinking, led Troopers Paluch and Hennessey to suspect that Millio might be intoxicated. The troopers caught up to Millio's car and turned on the roof lights of their police cruiser. At that point, they noticed that there was a crack in the windshield of Millio's car [Tr. at 14, 52.] They signaled Millio to pull over. Millio complied.

Trooper Paluch approached the driver's side of Millio's car and asked Millio for his driver's license and registration. Millio could not find either of these two items, but he did produce the record of convictions stub which is normally attached to a New York State driver's license.

Paluch asked Millio to get out of his car. He noted that Millio's eyes were bloodshot and that his breath smelled of alcohol. Millio, Paluch, and Hennessey then walked to a point behind Millio's car, where Millio was given a sobriety test. Approximately 15 minutes elapsed from the time Millio was stopped until the time he completed the tests. The test was favorable to Millio. The officers concluded that the result did not require any action on their part. [Tr. at 17, 34, 57.]

At some point, Trooper Hennessey opened the passenger-side door to Millio's car in order to search the glove box for Millio's registration. Trooper Hennessey testified that he was looking only for the registration and not for a gun. However, he admitted that he had been told Millio might be carrying a gun. [Tr. at 58–59.]

After passing the sobriety test, Millio still could not produce a registration or driver's license. Trooper Hennessey then went to the police cruiser and radioed for a data check on Millio's vehicle and license. Millio was found to have a valid license, but there was a "scofflaw" against the car registration.[1] A scofflaw is an indication that a vehicle has three or more unpaid parking tickets against it. [Tr. at 88.]

The troopers testified that they believed that the City of Buffalo might want to repossess the car because of the unpaid fines. In fact, the City of Buffalo does not repossess cars in these circumstances. Rather, the scofflaw would prevent the renewal of the car's registration until the fines were paid. [Tr. at 88–90.] Paluch asked Millio to wait in the back seat of the police cruiser while troopers contacted City officials regarding the scofflaw. Millio and Hennessey then entered the back seat of the police cruiser.

A call to the City officials was never made. Paluch decided that he would turn off the engine of Millio's car, which by this time had been running for about 15 minutes. Paluch testified that his decision was based upon considerations of safety. He also testified that there was no reason why Millio could not have been asked to turn the car off himself. [Tr. at 41.] Paluch approached Millio's car, opened the door, reached inside, and turned off the ignition. He looked down at the floor of the car and saw a sock protruding about two inches from beneath the driver's seat. The shape of the sock resembled the butt end of a handgun, although Paluch at this point was not certain that a gun was enclosed in the sock. He did not have to move anything in order to see the sock. Paluch picked up the sock and discovered the 9 mm. Browning automatic pistol inside. Millio was placed under arrest soon thereafter for illegal possession of the weapon. [Tr. at 19–21, 42.] The matter of the scofflaw against Millio's car was not pursued any further.

---

1. By this time, the troopers knew that the car was not registered to the defendant. The data check done by Hennessey indicated that the car was registered to Jenny Millio. [Tr. at 33, 54, 60.]

The government argues that there were objective facts sufficient to justify stopping Millio for an alcohol-related traffic offense. The government concedes that this stop was pretextual—that the police were really interested in Millio because he was suspected of carrying a gun. The government also concedes that it was illegal to stop Millio upon a pretextual basis. However, the government contends that the information regarding the scofflaw against Millio's car was an intervening event which was the efficient cause of obtaining the weapon. This "intervening" event is said to be sufficiently distinct from the pretextual stop as to be untainted by the illegality of that stop.

The court does not accept this as an accurate view of the facts. The pretext did not end with the conclusion of the sobriety test. Rather, it continued with the investigation of the scofflaw. It would strain credulity to believe that an investigation involving two F.B.I. agents, two State Police investigators, and two State troopers, the object of which was to ascertain whether Millio was carrying a gun was sidetracked by a desire to pursue the scofflaw against the car Millio was driving. Stopping Millio for a suspected driving while intoxicated offense was concededly a pretext. When this pretext ended unsuccessfully, another pretext was initiated.

Millio had been standing behind his car and in front of the Paluch-Hennessey police cruiser when he took the field sobriety test. Investigators Furman and Bigelow were in an unmarked car parked behind the police cruiser. The latter vehicle remained on the scene after Millio passed the sobriety test. [Tr. at 32, 37–38.] It is not reasonable to believe that the two investigators remained at the scene merely for the purpose of pursuing the matter of the scofflaw and that the overriding purpose of finding a weapon was abandoned.

The conduct and testimony of Trooper Paluch provide even clearer support for the conclusion that the scofflaw was merely another pretext to extend Millio's confinement and find a weapon in his possession.

Millio's car was left running during the period in which he passed the sobriety test. It continued to be left running as Millio accompanied Hennessey to the back of the police cruiser. Paluch then approached Millio's car in order to turn off the ignition. The window on the driver's side was open, and Paluch could easily have reached inside to turn the key. He did not do so. Instead, he opened the door.

Q. Why did you do that?

A. [Paluch] Just in my experience as a police officer, to give me a better observance, or capability of observing what is inside the vehicle.

[Tr. at 22.] Of course, the officers knew that their assignment was to stop Millio because he was "supposedly armed and dangerous." [Id.] Asked again why he went into Millio's car, Paluch candidly admitted that one of his reasons was to look for a gun which he suspected was in the car. [Tr. at 40, 42.] Based upon this evidence and the record as a whole, I find that the scofflaw was a pretext for the continued detention of the defendant. Concomitantly, I reject the testimony that considerations of safety prompted the decision to turn off Millio's car. Millio's car had already been left running for a long time and, with four law enforcement officers on the scene, there was no danger that Millio or anyone else would enter it. The "danger" that the vehicle posed to passers-by did not exist. Rather, it was a pretext for entering and searching Millio's car.

The court notes that the objective facts known to the police were sufficient to justify a stop for a possible alcohol-related traffic offense. Millio had been drinking, he was driving very slowly, and the troopers saw him weaving within his lane of traffic. This was sufficient for an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. *See, e.g., United States v. Nargi*, 732 F.2d 1102 (2d Cir.1984). However, the investigative stop was a pretext, and I have found that the discovery of the gun was the direct consequence of this and the con-

49

tinued pretextual detention of Mr. Millio, ostensibly for the purpose of investigating the scofflaw.

 It is impermissible for law enforcement officers to use an arrest as a pretext to search for evidence. *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *Taglavore v. United States*, 291 F.2d 262, 265 (9th Cir.1961); *cf., United States v. Prim*, 698 F.2d 972 (9th Cir.1983) (use of pretext after the fact to justify an arrest or search violates the fourth amendment). In *Amador-Gonzalez v. United States*, 391 F.2d 308 (5th Cir.1968), the court held that a pretextual arrest for a minor traffic offense could not serve as the basis for a search of the arrestee's car. In *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), the Court of Appeals cited *Amador-Gonzalez* and stated: "It may well be that the same view should prevail with respect to a "plain view" of the inside of a car resulting from a pretextual stop ...." 485 F.2d at 368.[2] Whether or not the present case would, under different facts, involve the "plain view" doctrine, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), it is clear that the seizure of the weapon was the result of pretextual police conduct. Unlike *United States v. Lester*, 647 F.2d 869 (8th Cir. 1981), the circumstances in this case give rise to the inference that the stop and detention were "effected for the purpose of creating an excuse to search." *Id.* at 873. The Browning 9 mm. automatic pistol seized from the defendant's automobile must be suppressed because the seizure of the weapon was the direct result of the illegal pretextual detention of the defendant.

The motion to suppress is granted.

So ordered.

2. In *Santana*, the court did not decide the question, because it upheld the seizure of evidence on the ground that the seizure was the result of a non-pretextual investigative stop.