UNITED STATES of America

v.

Ralph SCOPO, Jr.

No. CR–92–184.

United States District Court, E.D. New York.

Feb. 19, 1993.

Andrew Weissman, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

James J. DiPietro, Aronne & DiPietro, Brooklyn, NY, Steven R. Kartagener (Kartagener & Stavis, of counsel), New York City, for defendant.

MEMORANDUM AND ORDER

GLASSER, District Judge:

Defendant Ralph Scopo was indicted by a Grand Jury in the Eastern District of New York for a violation of 18 U.S.C. § 922(k) which makes it a crime to "knowingly and willfully possess a handgun, which has had the manufacturer's serial number removed, obliterated and altered and has, at some time, been shipped and transported in interstate commerce." Now before this court is defendant's motion to suppress physical and statement evidence obtained from him on the night of January 17, 1992. More specifically, defendant contends that the New York City Police detectives who stopped and searched his car—purportedly because he committed a minor traffic infraction—violated his fourth amendment right to be free from unreasonable searches and seizures. Defendant therefore claims that the handgun the detectives discovered in "plain view" was the fruit of an illegal, pretextual search and must be suppressed.[1]

On July 2, 1992, this court conducted a suppression hearing on defendant's motion. At the hearing, the government presented the testimony of three witnesses: FBI Special Agent R. Lindley DeVecchio, who was not present on the evening of January 17, 1992 and testified only as a specialist on activities of the Colombo Organized Crime Family; and New York City Police Detectives Matthew Higgins and Benjamin Gozun, both of whom were directly involved in defendant's arrest. The facts recounted below rely on the testimony elicited from these witnesses. Following the hearing, defendant and the government submitted briefs addressing the appropriate test for this court to apply in evaluating a "pretextual" search. While both parties agree that an "objective" test is appropriate, they disagree on the precise contours of that test. For the reasons provided below, this court adopts the stan-

---

1. In his initial memorandum, defendant also moved for an order striking the alias "Ralphie" from the caption of this case. Rejecting the conclusion that the defendant would suffer undue prejudice from the nickname's inclusion, the government nevertheless agreed not to oppose deletion of the name. Accordingly, the caption is refashioned as denoted on this opinion and on the government's Post-Trial Brief.

dard announced and applied by the Sixth, Tenth and Eleventh Circuits and accordingly grants defendant's motion to suppress.

## FACTS

Before detailing the specific events of January 17, 1992, it is helpful to examine the context in which this weapon seizure took place. In November of 1991, a "shooting war" broke out between feuding factions of the Colombo Organized Crime Family; on that date, loyalists to Victor Orena, acting boss of the Colombo Family, attempted to murder Greg Scarpa, a loyalist to incarcerated boss Carmine Persico. *Tr.* at 6–7.[2] Prior to the date of Scopo's arrest, six known murders and at least a dozen attempted murders took place in connection with this shooting war. *Tr.* at 7. "Hit teams" made up of "shooters" would travel "caravan" style to carry out these violent acts. *Tr.* at 6. The Federal Bureau of Investigation and the New York City Police Department together formed a Colombo Strike Force to respond to this "war," and more specifically, to determine "who the shooters were, discover the safe houses, to try to get the guns off the street, to deter them as best we can." *Tr.* at 8. In the words of Detective Higgins, the Strike Force was "doing active, aggressive law enforcement as well as surveillance." *Tr.* at 27, 43–44, 57.

On January 17, 1992, several New York City police detectives assigned to the Strike Force, including Detectives Higgins and Gozun, were conducting covert surveillance of the Mill Basin Social Club. *Tr.* at 27, 45, 69–70. That club, located at 6334 Avenue N, in Brooklyn, New York, is a known meeting place for members of the Orena faction of the Colombo Family. *Tr.* at 10.[3] At approximately 8:30 p.m., Detective Higgins observed two unoccupied cars, a 1992 Cadillac and a 1987 Chevrolet Blazer, parked in front of the club. *Tr.* at 28–29. Shortly thereafter, the detectives saw four men exit the club, two of whom were identified as Joseph Scopo, de-

fendant's brother and the underboss of the Colombo family, and Salvatore Micciotta, a "capo" in the family. *Tr.* at 28. The men entered four cars, including the above-mentioned Cadillac and Blazer, and drove away in what appeared to the Detectives to be "caravan" style. *Tr.* at 28–29.

Detective Higgins and his team followed the cars to 1378 East 72nd Street in Brooklyn, the residence of Joseph Scopo. *Tr.* at 29, 55. After temporarily losing sight of all four cars, the detectives then located the 1992 Cadillac and 1987 Blazer double parked on the wrong side of the street in front of the residence of Salvatore Micciotta. *Tr.* at 30, 56–57. Neither of the vehicles received a traffic summons at this time, although the detectives had summonses in their cars and the vehicles were parked in violation of New York City traffic regulations. *Tr.* at 30, 44–45, 58–59. The detectives saw two men enter and soon exit the Micciotta residence; one of these men was observed carrying a rifle case, and the officer who made this observation relayed the information to the entire team. *Tr.* at 30–31. The man carrying the rifle, later identified as Anthony Mesi, entered the 1987 Blazer, and the second man, defendant Scopo, entered the 1992 Cadillac. *Tr.* at 31–32.

Driving away again in what the detectives identified as "caravan" style, the two cars proceeded to Flatlands Avenue in Brooklyn. *Tr.* at 33, 94. Detective Higgins's team of four or five unmarked automobiles, containing nine detectives, followed. *Tr.* at 31–32, 45–46. At approximately 9:00 p.m. the detectives allegedly observed the drivers of both cars fail to signal when changing lanes on two occasions. *Tr.* at 32–33, 63–64. There were no other vehicles on the street, and the two cars were driving within the speed limit. *Tr.* at 64, 69. When the vehicles eventually stopped at a red light at the corner of Fountain Avenue and Stanley Street, the officers "boxed" the cars in by positioning the police

---

**2.** All references to *"Tr."* refer to the transcript of the July 2, 1992 Suppression Hearing.

**3.** At the hearing, defendant's counsel elicited a great deal of testimony concerning whether defendant was in the "Cafe on Avenue N," which

has a plate glass window, or the social club, which has a brick-front wall. *Tr.* at 47, 49, 54. For the purposes of this motion, this court finds the difference to be irrelevant.

cars "in front, to the side and the rear." *Tr.* at 34, 73.

Detectives Higgins and Maggiore exited their vehicle and approached Scopo's Cadillac on the driver's side; Detective Gozun approached the vehicle from the passenger's side. *Tr.* at 34, 75, 77. Detectives Higgins and Gozun had their guns in their hands; Detective Maggiore also may have had his gun drawn. *Tr.* 77–78, 97, 105, 112. As Higgins approached defendant's car, he observed Scopo throw an object—later identified as a cellular phone—into the back seat of the car. *Tr.* at 35, 38, 80–82. Detective Maggiore removed Scopo from the driver's seat, and Detective Higgins conducted a frisk for weapons. *Tr.* at 35. In the meantime, Detective Gozun looked in the car and observed in "plain view" the butt of a handgun protruding from an opaque pouch behind the passenger seat. *Tr.* at 82–83, 98. Upon recovering the gun, Detective Gozun yelled to the other detectives "I got one ... I got a gun." *Tr.* at 36, 98, 105–06. Noting that the gun was a fully loaded .38 caliber pistol with the manufacturer's serial numbers obliterated, *Tr.* at 98, Detective Gozun handcuffed Scopo and formally placed him under arrest. This stop occurred at a distance of approximately two miles from the location where the drivers failed to signal. *Tr.* at 114.[4]

The police officers transported Scopo to the 75th precinct where he was issued a traffic summons by Detective Higgins for violating New York Vehicle and Traffic Law § 1163(d). *Tr.* at 32–33, 37, 88–89, 91, &

Exh. 2. After being read his *Miranda* rights, Scopo allegedly said "Fuck those A–B–C men, they promised my father ten and they gave him one hundred and fifteen." *Tr.* at 37, 88. Like Scopo, Mesi also was taken to the precinct and issued a traffic ticket. *Tr.* at 95. The Kings County District Attorney's office later discovered that the hunting rifle was legitimately in Mesi's possession and declined to prosecute him on gun charges. *Tr.* at 86. Scopo, however, still faces gun possession charges in this court.

## DISCUSSION

Defendant Scopo moves to suppress both the gun and the statement he uttered at the 75th precinct. Arguing that the New York City detectives issued the traffic summons as a pretext to enable them to search his car for weapons, Scopo urges this court to suppress the "fruits" of this unreasonable and therefore unconstitutional arrest. *See Wong Sun v. United States,* 371 U.S. 471, 485–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963).[5] In response, the government contends that the detectives had probable cause to arrest Scopo for violating the traffic law; alternatively, the government argues that the detectives' reasonable suspicion that criminal activity was afoot justified their "investigative stop." *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). This court will address the reasonable suspicion argument first before discussing the heart of the matter at issue: the appropriate test for pretextual searches in this circuit.[6]

---

4. Defense witness Robert Cuccinello established the precise distance of 2.2 miles by measuring from East 103rd Street and Flatlands Avenue to the intersection of Fountain and Stanley Avenue.

5. In its initial brief, the government contended that Scopo lacked standing to challenge the search because he did not establish a legitimate expectation of privacy in the searched area. Citing the cases of *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), *United States v. Pena,* 961 F.2d 333 (2d Cir.1992), and *United States v. Paulino,* 850 F.2d 93, 96 (2d Cir.1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989), the government claimed that defendant's failure to include an affidavit—based on personal knowledge—that attested to these privacy interests was fatal to his fourth amendment claim. Defendant thereafter submitted a reply affidavit stating:

On [January 12, 1992], I was driving a 1992 Cadillac, when I was stopped by police officers. That vehicle is owned by me and registered in my name. Accordingly, it is respectfully submitted that I had, at the time, a legitimate expectation of privacy with respect to that vehicle, and its contents.

(Affidavit of Ralph Scopo, Jr., at ¶ 2) Based on this submission, the government no longer appears to contest defendant's standing. Accordingly, this court proceeds directly to the merits of defendant's arguments.

6. Defendant argues that a federal court confronting the legality of an arrest under state law also must apply state law to determine whether it should suppress any evidence seized as a result of that arrest. Reference to Second Circuit and Supreme Court precedent, however, indicates that this assertion is ill-founded. As the Court

**296**

### I. *Reasonable Suspicion to Investigate*

■ As an initial matter, *Terry* authorizes police officers to make an investigative stop of an individual when the officers are aware of "specific and articulable facts" giving rise to a reasonable suspicion that the person is or has been engaged in illegal activity. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. The government argues that detectives in this case observed members of the Orena faction of the Colombo Family leave a known Colombo hangout, proceed in "caravan" style to homes of the members, and put a rifle in one of the cars. According to the government, these observations, coupled with the detectives' knowledge of the ongoing war between the Orena and Persico factions of the Colombo Family, gave them "reasonable suspicion which warranted the investigative stop" of Scopo's automobile. (Government's Post–Hearing Memorandum of Law at 8) However, according to Detective Higgins's suppression hearing testimony, neither he nor his colleagues, at the time of the "stop," had information that defendant Scopo was committing a crime. *Tr.* at 50, 60. In fact,

"outside of the traffic infraction," the officers had no "evidence of criminality concerning the Scopo vehicle." *Tr.* at 75. In light of this testimony, it appears that the officers who "stopped" Scopo's car were not aware of "specific and articulable facts" giving rise to a "reasonable suspicion" that Scopo was or had been engaged in illegal activity.

■ Furthermore, even if this court were to conclude that the officers possessed a sufficient factual basis for an investigative stop, " '[i]f an investigative stop based on reasonable suspicion continues too long or becomes *unreasonably intrusive*, it . . . ripen[s] into a *de facto* arrest that must be based on probable cause.' " *United States v. Babwah*, 972 F.2d 30, 33 (2d Cir.1992) (*quoting United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir.1992)) (emphasis added); *see also United States v. Streifel*, 665 F.2d 414, 422 (2d Cir.1981) (holding that stop must be reasonable both in its intrusiveness and duration). Review of the testimony from the suppression hearing compels this court to characterize the detectives' behavior on the

stated in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960):

[W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. *The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.*

*Id.* at 223–24, 80 S.Ct. at 1447–48 (emphasis added); *see also United States v. Magda*, 547 F.2d 756, 757 n. 2 (2d Cir.1976) ("[I]n a federal prosecution, it is federal law, not state law, which determines whether a search or seizure conducted by state police officers was reasonable."), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Turner*, 558 F.2d 46, 49 (2d Cir.1977) ("This is a federal prosecution, and federal law determines whether suppression is appropriate.").

Review of the cases upon which defendant relies to argue that state search and seizure law governs this suppression motion does not refute

this conclusion. Rather, those cases support the proposition that an officer's authority to arrest a suspect on federal charges may derive from state law if no federal statute applies. *See United States v. Di Re*, 332 U.S. 581, 588–89, 68 S.Ct. 222, 225–26, 92 L.Ed. 210 (1948) (holding that, in absence of federal statute, validity of warrantless arrest determined by state law); *Ker v. California*, 374 U.S. 23, 37, 83 S.Ct. 1623, 1631, 10 L.Ed.2d 726 (1963) ("This court, in cases under the Fourth Amendment, has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution."). In this case, the traffic and vehicle law discussed in text authorized the officers to arrest defendant for his alleged traffic violation. After making the determination that state law provides a grounds for the arrest, however, this federal court must look to federal pretext doctrine to determine that arrest's constitutionality.

Finally, insofar as this court has decided to grant defendant's motion to suppress on federal grounds, it declines to discuss defendant's request that it use "its supervisory powers governing the admission of evidence" to consider "the blatant illegality of the New York City Police detectives' actions under state law, and the apparent efforts to avoid the consequences of that police misconduct by resorting to this federal prosecution, when deciding whether the evidence should be precluded." (Defendant's Memorandum of Law at 8 n. 2).

evening of January 17, 1992 as an arrest and not merely as an investigative stop.

■ The Supreme Court has acknowledged that a "traffic stop" of a vehicle by a policeman is a "seizure" within the meaning of the Fourth Amendment. *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984); *see also Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ("stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief."). *Berkemer* posed the question of whether police officers who detained and interrogated at roadside a motorist who had committed a minor traffic violation were obliged to give *Miranda* warnings. *Id.* 468 U.S. at 435, 104 S.Ct. at 3147. Holding that this type of detention did not constitute "custodial interrogation," the Court provided an explanation that both contextualizes *Terry* stops and sheds light on the nature of Scopo's detention:

> Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to "speak where he would not otherwise do so freely," *Miranda v. Arizona,* 384 U.S. 436, 467 [86 S.Ct. 1602, 1624, 16 L.Ed.2d 694] (1966). First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. . . . Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. . . . In both of these respects, the usual traffic stop is more analogous to a so-called *"Terry* stop," see *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni–Ponce,* 422 U.S. 873, 881 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607] (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid.* (quoting *Terry v. Ohio, supra,* [392 U.S.] at 29 [88 S.Ct. at 1884].) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestions in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.*

*Id.* 468 U.S. at 437–40, 104 S.Ct. at 3148–50 (footnotes omitted). This quotation is instinct with the language of reasonableness. In contrast, as Scopo argues, the "stop" to which he was subjected was anything but "ordinary," "usual," or "noncoercive": nine police detectives used their four or five cars to surround and box in his automobile on all sides; at least three detectives converged upon defendant with their guns drawn; Detective Maggiore "hollered" at Scopo and removed him from his Cadillac at gunpoint; Detective Higgins frisked him. Clearly, Scopo could not reasonably have believed that he was free to leave. On these facts, this court finds that the detectives clearly subjected Scopo to a full-blown arrest.

Second Circuit precedent supports this finding. For example, in *United States v. Marin,* 669 F.2d 73 (2d Cir.1982), the court of appeals faced the question of whether it should suppress narcotics as the fruit of an illegal search. Judge Kearse, writing for the *Marin* court, noted that "probable cause is necessary when police restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be 'tantamount' to an arrest. . . . The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of

the individual, and the reason for the restraint." *Id.* at 81. Based on the following facts, the *Marin* court found that the officers' actions constituted an arrest:

> In cases involving stops of cars, we have considered the number of police officers and cars used to effect the stop; whether the police blocked the car in motion or otherwise completely impeded its movement, or whether they merely pulled up near it; and whether the police officers had their guns drawn and in view. *See United States v. Ceballos,* 654 F.2d 177, 183 n. 9 (2d Cir.1981); *United States v. Jackson,* 652 F.2d 244, 249–50 (2d Cir. 1981); *United States v. Vasquez,* 638 F.2d 507, 521 (2d Cir.1980).... Romero's car was stopped by DEA agents, after one of Romero's U-turns on a dead-end street, by means of three or four DEA cars blocking its forward progress, and one DEA car directly behind. There was evidence that the agents rapidly surrounded the Cadillac with their guns drawn, and at least two of the occupants of the car were physically removed from the car by the agents. Marin, as he was being frisked, tried to walk away and was physically restrained by Agent Papantoniou. Romero would have been no freer to leave; Agent Hanna testified that he would physically have prevented any similar attempt by Romero. Thus, while the defendants were not formally placed under arrest until after the cocaine was found in the trunk, we conclude that the initial stop of the car was sufficiently forceful and intrusive that it was tantamount to an arrest.

*Id.* at 81. The *Marin* court went on to hold that the officers in that case did, in fact, have probable cause to effect the arrest in question. The facts recounted in *Marin* are sufficiently similar to the events that occurred on January 17, 1992 to lead this court to conclude that Scopo was the subject of a full-blown arrest for which probable cause was required. *See also United States v. Sanchez,* 719 F.Supp. 128, 132–33 (E.D.N.Y.1989), *aff'd without opinion,* 902 F.2d 1556 (2d Cir. 1990).[7]

The government responds to this conclusion by arguing that the detectives' precautions on the evening in question did not convert the investigative stop into an arrest because the detectives merely conducted themselves in a manner warranted by the possibility of danger. For support, the government cites several cases that describe specific precautions deemed reasonable in light of the circumstances faced by the officers; rather than standing for the narrow exceptions for which they are cited, however, these cases also reiterate the general proposition that a court must evaluate the reasonableness of the officers' behavior, taken as a whole, to decide whether an intrusion was justified. *See United States v. Nargi,* 732 F.2d 1102, 1106 (2d Cir.1984) ("A display of guns by the police ... does not *automatically* convert a stop into an arrest.") (emphasis added); *United States v. Pelusio,* 725 F.2d 161, 166 (2d Cir.1983) ("Given the importance of the law enforcement interest in locating the persons suspected of committing serious crimes that day and in preventing further violence, the police intrusion [including blocking of defendant's car during investigative stop] was reasonable."); *United States v. Harley,* 682 F.2d 398, 402 (2d Cir.1982) ("The nature of the crime under investigation, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness."). Based on their observations of Scopo and Mesi, and ignoring for the moment the traffic violation, the police officers in this case did not have sufficient justification for surrounding and "boxing in" the two cars, drawing their weapons, and pulling

---

7. In *Sanchez,* Judge Bartels explained:

[T]he so-called 'investigatory stop,' though not justified, turned out to be more. The agents pulled one of their cars in front of the white Honda car and another agent's car in the back of the Honda, so that the defendant's freedom of movement was completely restrained. At the same time, several officers, with their guns drawn, surrounded the Honda, and the agent's car in back of the Honda had a red light flashing on its dashboard. Furthermore, none of these actions by the agents had been necessitated by Sanchez's conduct. Considering all of these circumstances, the agents had effected an arrest of Sanchez even before he was ordered out of the car; no reasonable man could have thought he was free to leave.

defendant and his companion from their vehicles.

## II. *Probable Cause to Arrest*

The government next argues that Scopo's violation of a provision of the New York Vehicle and Traffic Law supplied them with the requisite probable cause to arrest. In response, defendant contends that the detectives used his failure to signal solely as a pretext for conducting a search of his car for weapons; absent this impermissible motive, he argues, no reasonable officer would have made an arrest on the stated grounds. The remainder of this opinion discusses the New York law applicable to defendant's arrest, then explains the current controversy surrounding the pretextual search doctrine, and finally describes why this court prefers the test adopted by the Sixth, Tenth and Eleventh Circuits as more consistent with the fourth amendment.

### A. *Arrest for Traffic Violation under New York Law*

Section 140.10(1)(a) of the New York Criminal Procedure Law provides that a police officer may arrest a person for "any offense when he has reasonable cause to believe that such person has committed such offense in his presence." N.Y.Crim.Proc. § 140.10(1)(a) (McKinney 1992). And section 155 of the New York Vehicle and Traffic Law states that "[f]or the purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense." N.Y. Veh. & Traf. § 155 (McKinney 1986). Detective Higgins testified that he saw the 1992 Cadillac and 1987 Blazer switch lanes without signalling in violation of New York Vehicle and Traffic Law § 1163(d). Since the detectives saw Scopo commit a New York State traffic offense in their presence, they had grounds to arrest him for that offense.[8] The question remains, however, whether the

search which followed was unreasonable and therefore unconstitutional if these officers arrested Scopo for a traffic violation that, absent their desire to search his car, they otherwise would have ignored. In order to respond, this court must first examine past and current pretext doctrine.

### B. *Pretextual Search Doctrine: the Supreme Court and the Circuits*

A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example ... occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity.

*United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988). The Supreme Court first recognized the existence of a pretext doctrine in *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932), stating in *dicta* that "[a]n arrest may not be used as a pretext to search for evidence." To date, however, the Court has not addressed the contours of this doctrine. *See Cummins v. United States*, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 449 (1991) (White, J., dissenting from denial of certiorari and arguing that the Court should "address this recurring issue and ... resolve the split in the Courts of Appeals"); *cf. Horton v. California*, 496 U.S. 128, 148, 110 S.Ct. 2301, 2314, 110 L.Ed.2d 112 (1990) (Brennan, J., dissenting) ("The Court's opinion today does not address pretextual searches, but I have no doubt that such searches violate the Fourth Amendment"). The courts of appeals, on the other hand, have extensively addressed the pretext doctrine.

---

**8.** Defendant argues that various New York cases support the inference that "absent the commission of a traffic violation that poses a threat to public safety ... or one in which the stopped motorist is unable to produce adequate identification of himself or sufficient proof of legal ownership or use of the vehicle, ... police officers should ordinarily stop a car and issue an offend-

ing motorist a traffic summons, rather than subject the motorist to an arrest." While this observation certainly informs New York pretext doctrine, it does not affect an officer's power, under the New York Vehicle and Traffic Law, to arrest a person who violates that law in the officer's presence.

All circuits to consider the proper test for determining the validity of a search in light of a pretext objection agree that an "objective" analysis—and not an inquiry into an officer's subjective intent—is appropriate. *See, e.g., United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 449 (1991); *United States v. Hope,* 906 F.2d 254, 258 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991); *Guzman,* 864 F.2d at 1515; *United States v. Causey,* 834 F.2d 1179, 1182 (5th Cir.1987) (en banc); *United States v. Miller,* 821 F.2d 546, 549 (11th Cir.1987) (applying *United States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986)). The source of this objective test is a trilogy of Supreme Court cases that instruct as follows:

> Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time ... and not on the officer's actual state of mind at the time the challenged action was taken."

*Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985) (*quoting Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *see also United States v. Villamonte–Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983) (quoting *Scott* and summarily rejecting argument that since customs officers' statutory authority to check vessel's documents was pretext for searching ship, narcotics should be suppressed).

However, the parameters of the so-called "objective test" remain the subject of vigorous debate. The Sixth, Tenth, and Eleventh Circuits adopt a "usual police practices" approach and ask "not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir.1989) (*quoting Guzman,* 864 F.2d at 1517); *see United States v. Crotinger,* 928 F.2d 203, 206 (6th Cir.1991); *United States v. Smith,* 799 F.2d 704, 710 (11th Cir.1986). In *Smith,* one of the earliest cases to announce this test, the Eleventh Circuit explained as follows:

> That an officer theoretically *could* validly have stopped the car for a possible traffic infraction was not determinative. Similarly immaterial was the actual subjective intent of the deputy. The stop was unreasonable not because the officer secretly hoped to find evidence of a greater offense, but because it was clear that an officer would have been uninterested in pursuing the lesser offense absent that hope.

799 F.2d at 710; *see also Crotinger,* 928 F.2d at 206 ("The *Smith* Court made an objective inquiry into whether a reasonable officer would have made the stop based on a probable cause for a traffic violation in the absence of an invalid purpose.").

In contrast, the Fifth, Seventh and Eighth Circuits have rejected any inquiry into "usual police practices" and instead apply an "authorization" test: "so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989), *aff'd on appeal after remand,* 925 F.2d 1064, 1065 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *Causey,* 834 F.2d at 1184; *see also United States v. Cummins,* 920 F.2d at 500–01 ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.... In our view, this otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in criminal activity. It is also our view that the stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.").

The factual pattern in *United States v. Trigg* is helpful in that it demonstrates the significance of this standard. In *Trigg,* officers first arrested defendant on an outstanding body attachment; he was soon released, but only after the officers discovered and did not reveal that defendant was driving with a suspended license. *Trigg,* 878 F.2d at 1038. Approximately six weeks later, one of the

officers involved in the original arrest began to suspect that defendant was involved in drug trafficking and requested permission to set up surveillance on defendant's automobile. Although the officer admittedly lacked probable cause to arrest Trigg for narcotics activity, he used his knowledge that Trigg was driving with a suspended license as grounds to re-arrest and search him. *Id.* Defendant challenged the search as the product of a pretextual, unconstitutional arrest, and the district court agreed. On review, the Seventh Circuit held that in considering a motion to suppress drugs found as a result of that search, the *only* permissible considerations for the district court on remand were:

> [D]id the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense. If these two factors are present, we believe that an arrest is necessarily reasonable under the fourth amendment.

*Id.* at 1041.

Relying on the Supreme Court case of *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), the *Trigg* court held that "usual police practices" were not relevant to whether an arrest was constitutional, explaining as follows:

> The Court ... has never indicated that the discretionary exercise of the arrest power, a power that is contingent upon a prior determination of probable cause, is constitutionally significant. In fact, in *Gustafson,* the Court expressly stated: "Though the officer here was not required to take the petitioner into custody by police regulations as he was in *Robinson* and there did not exist a departmental police [sic] establishing the conditions under which a full-scale body search should be conducted, we do not find these differences determinative of the constitutional issue [citation omitted]. It is sufficient that the officer had probable cause to arrest and that he lawfully effectuated the arrest and placed the petitioner in custody."

*Trigg,* 878 F.2d at 1041 (*quoting Gustafson,* 414 U.S. at 265, 94 S.Ct. at 492); *see also Trigg,* 925 F.2d 1064, 1065 (7th Cir.1991) (explaining, on appeal after remand, "[a]s we stated in *Trigg,* and in light of the position established in *Gustafson* and *Villamonte-Marquez* by the Supreme Court, we cannot consider the conformance of an arrest to usual police practices in determining the reasonableness of an arrest. Rather, we must focus on probable cause and the lawfulness of the arrest as does the Supreme Court. We recognize that such an approach virtually eliminates the concept of a 'pretextual arrest,' however, we believe this approach is consistent with *Gustafson* and *Villamonte-Marquez*."). Notably, however, the *Trigg* court ignored two footnotes from *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), which cast doubt on the conclusion that "usual police practices" are constitutionally insignificant under *Gustafson.* First, in his *Robinson* concurrence, Justice Powell explained as follows:

> In *Gustafson, post* [414 U.S.] p. 260 [94 S.Ct. p. 488] the petitioner conceded the validity of the custodial arrest, although that conclusion was not as self-evident as in *Robinson. Gustafson would have presented a different question if the petitioner could have proved that he was taken into custody only to afford a pretext for a search actually undertaken for collateral objectives.* But no such question is before us.

*Robinson,* 414 U.S. at 238 n. 2, 94 S.Ct. at 494 n. 2 (Powell, J., concurring) (emphasis added). Second, in the *Robinson majority* opinion, Justice Rehnquist stated:

> Respondent argued below that [Officer] Jenks may have used the subsequent traffic violation arrest as a mere pretext for a narcotics search which would not have been allowed by a neutral magistrate had Jenks sought a warrant.... We think it is sufficient for purposes of our decision that respondent was lawfully arrested for an offense, *and that Jenks' placing him in custody following that arrest was not a departure from established police department practice.* See n. 2, *infra. We leave for another day questions which would arise on facts different from these.*

*Id.* 414 U.S. at 221 n. 1, 94 S.Ct. at 470 n. 1 (emphasis added).

Other circuits to address the pretext doctrine have continued to reiterate a preference for an "objective" test but have not expressed which of the above two standards they prefer. *See, e.g., United States v. Burney,* 1991 WL 126568, *3, 1991 U.S.App. LEXIS 15107, *7–8 (4th Cir.1991) (reciting both tests and holding that "evidence introduced at the suppression hearing would support the validity of the stop under either of these two approaches."); *United States v. Mitchell,* 951 F.2d 1291, 1295 (D.C.Cir.) ("Here, the objective circumstances clearly justified stopping the car. The trial court credited [the officer's] testimony that the car was speeding and had made a turn without a signal...."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1991); *United States v. Lillard,* 929 F.2d 500 (9th Cir.1991) (rejecting argument that search was pretextual because after stopping van for speeding, officers smelled "a distinct odor they knew was associated with making methamphetamine" which "coupled with the earlier suspicions that Lillard was making the drug supports the conclusion that there was probable cause to arrest."); *United States v. Hawkins,* 811 F.2d 210, 213 (3d Cir.) (concluding that officers had reasonable suspicion to conduct investigative stop and holding that officers' proffer of pretext did not invalidate otherwise constitutional search), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

## C. *Pretext in the Second Circuit*

The Second Circuit has not yet spoken directly on the proper standard for pretextual searches, and reference to cases from this circuit indicates that the test for pretext remains very much unresolved. First, in *United States v. Millio,* 588 F.Supp. 45 (W.D.N.Y.1984), the defendant moved to suppress a gun seized from his car by officers who stopped him for driving while intoxicated. After administering a sobriety test, which defendant passed, the officers ran a search on his license and registration and found a "scofflaw"—an indication that the vehicle had three or more unpaid parking tickets. *Id.* at 47. The government agreed that the officer's original stop was pretextual—effected solely to search the car for a weapon—but argued that the scofflaw was a distinct intervening event which gave rise to discovery of the weapon. *Id.* at 48. Although the court concluded that the objective facts known to the police were sufficient to justify the original *Terry* stop, it nonetheless suppressed the pistol "because the seizure of the weapon was the direct result of the illegal pretextual detention of the defendant." *Id.* at 49.

A second case from this circuit in which the issue of pretextual searches arose is *United States v. Piccirillo,* 92–CR–929 (December 8, 1992). In the transcript of a suppression hearing from that case, Judge Amon rejected the argument that a traffic stop of a suspected participant in the Colombo Family "war" was pretextual and therefore invalid. Looking "to objective circumstances in determining the legitimacy of the police officers rather than the officers' state of mind," Judge Amon found that defendant cut off other cars, wove in and out of lanes without signalling, and made turns without signalling. (*Piccirillo* transcript at 8–9) This dangerous behavior, she concluded, provided the officers with reasonable suspicion to conduct an investigative stop of the vehicle.

Third, in *United States v. Nersesian,* 824 F.2d 1294, 1315–17 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987), the Second Circuit addressed a pretext argument made by Elias Abdouch, one of many defendants convicted of participating in a narcotics conspiracy. Abdouch claimed that a DEA agent's continuation of an initially valid *Terry* stop was unlawful because it was based on a pretext unrelated to narcotics. *Id.* at 1316. Citing *Terry, Hawkins,* and the Supreme Court caselaw referred to above, the *Nersesian* court rejected any inquiry into the officers' subjective intent and explained:

> In our view, a valid basis for a detention and search which exists in the first place, is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search. While in most instances it would seem appropriate for the police to be forth-

right and honest in expressing the basis upon which they are relying in conducting an investigatory stop and search, the justification given by the police is not essential in determining whether the apprehension is constitutionally justified. The pivotal factor in determining whether a search violates the fourth amendment is whether there exists at the outset a valid basis for that search. In this instance, it is not disputed that such a valid basis existed. Therefore, we hold that subsequent intervention by another law enforcement officer, relying upon a pretextual basis to carry out a search, does not alter the validity of the initial detention or the sequence of events following in its wake. *Id.* at 1316. Contrary to the government's argument, *Nersesian* does not dictate the result in Scopo's case, for this court must determine whether, in fact, the basis for the search was valid in the first place.

Fourth and finally, the Second Circuit opinion in *United States v. Caming*, 968 F.2d 232 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992), indicates the court's most recent voice on the pretext doctrine. The defendant in *Caming*, charged with structuring currency transactions to avoid currency transaction reports, was arrested in his automobile while leaving the parking lot of his athletic club. An initial and then an inventory search of that vehicle disclosed various financial documents and records which the government sought to introduce into evidence at trial. Defendant moved to suppress this evidence, arguing that the officers who arrested him pursuant to a valid warrant purposely delayed that arrest to enable them to search his automobile. *Id.* at 234–35. The district court denied this motion, defendant was convicted, and he appealed.

Agreeing with the district court's factual finding that defendant had not "shown that his arrest was a pretext to enable the agents to search his car," *id.* at 236, the Second Circuit quoted the following language from the lower court's opinion:

"When a police officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous inci-

dent of that arrest, search the passenger compartment of the vehicle.... Where, however, it appears that the search and not the arrest was the real purpose in effecting a warrantless search of the premises, 'and that the arrest was a pretext for or at most an incident of the search,' the search is unreasonable under the Fourth Amendment." *United States v. Sohnen*, 298 F.Supp. 51, 56 (E.D.N.Y.1969) (quoting *Henderson v. United States*, 12 F.2d 528, 531 (4th Cir.1926); *see United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *McKnight v. United States*, 183 F.2d 977, 978 (D.C.Cir.1950). *Id.* at 235 (*quoting United States v. Caming*, 756 F.Supp. 121, 123–24 (S.D.N.Y.1991)). The Second Circuit agreed with the district court that defendant's arrest was not unreasonably delayed based primarily on two observations: first, that the officers who executed Caming's arrest took reasonable precautions to preserve their own safety and to avoid arousing the suspicions of other suspects still under investigation; second, if the officers were conducting a pretextual search, they probably would have arrested defendant in his apartment where evidence of this crime was more likely to be located. *Caming*, 968 F.2d at 236. While the language from the lower court's opinion was not essential to the circuit court's holding, quotation of that language suggests that the pretext doctrine retains vitality in this circuit. *See United States v. Giampa*, 1992 WL 249885, *3, 1992 U.S.Dist. LEXIS 14266, *8 (S.D.N.Y.1992) (citing *Caming* for proposition that where "it appears that the search and not the arrest was the real purpose in effecting a warrantless search of the premises, and that the arrest was a pretext for at most an incident of the search, the search is unreasonable under the Fourth Amendment."); *United States v. Cook*, 1991 WL 190564, *5, 1991 U.S.Dist. LEXIS 12891, *15–16 (S.D.N.Y.1991) (describing pretextual search doctrine and concluding, based on officer's testimony, that stop for erratically changing lanes was "a legitimate and nominally intrusive traffic stop.").

D. *The Arrest and Search of Scopo's Car*

■ As the discussion above makes abundantly obvious, pretext doctrine remains a

matter for debate both in this circuit and nationwide. While inquiry into an officer's subjective motivation and intent clearly is not appropriate, the precise contours of the objective test that this court must apply are not defined. Accordingly, this court must choose the test for pretextual searches and seizures that it finds most faithful to the spirit and language of the fourth amendment. After much deliberation, it adopts the first test described above, specifically "whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." As the *Smith* court pointed out, this formulation mirrors the language and intent of *Terry:*

> "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

*Smith,* 799 F.2d at 710 (*quoting Terry,* 392 U.S. at 22, 88 S.Ct. at 1880). Clearly, courts are capable of engaging in this type of inquiry; indeed, the fourth amendment, with its explicit concern for reasonableness, would seem to require it.

More importantly, this test "properly preserves the Supreme Court's requirement of an objective inquiry into Fourth Amendment activity ... and provides meaningful judicial review of discretionary police action." *Guzman,* 864 F.2d at 1517. Recognizing that officers often rely on their intuition to investigate criminal activity, this court nevertheless finds constitutionally repugnant the result to which adoption of the "authorization" test leads, as *Trigg* makes obvious: that test immunizes from judicial scrutiny any arbitrary and unreasonable use by police officers of minor violations. As the *Guzman* court explained:

> An examination of a police officer's subjective intent in individual cases would unwisely involve the courts in unproductive inquiries.... Conversely, an objective test that asks no more than whether some set of facts might justify a given stop would permit arbitrary intrusions in situations such as traffic stops. Under such a

test, thousands of everyday citizens who violate minor traffic regulations would be subject to unfettered police discretion as to whom to stop. To paraphrase one commentator, in the absence of standardized police procedures that limit discretion, whether we are simply allowed to continue on our way with a stern look, or instead are stopped and subjected to lengthy and intrusive interrogation when we forget to wear our seat belts, turns on no more than "the state of the digestion of any officer who stops us or, more likely, upon our obsequiousness, the price of our automobiles, the formality of our dress, the shortness of our hair or the color of our skin."

*Guzman,* 864 F.2d at 1516 (*quoting* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 416 (1974)).

Applying the "usual police practices" standard in the present case, this court finds that a reasonable officer would not have arrested Scopo for failing to signal in the absence of an invalid purpose to search for weapons. Unlike the situation facing Judge Amon in *Piccirillo,* defendant's failure to signal posed no threat to the public safety: the violation occurred at nine in the evening, no other vehicles were on the street, and the cars were not speeding. *Tr.* at 64. In fact, Flatlands Avenue was so empty that even the officers did not remember whether they had signalled. *Tr.* at 72. Furthermore, despite the empty streets, the officers waited over two miles before deciding to stop the vehicles; however, Detective Higgins admitted that it would be "routine for a uniformed officer to pull a vehicle over immediately upon citing or seeing a VTL violation." *Tr.* at 69–70. Finally, earlier that same evening, the detectives who were authorized to enforce the traffic laws, failed to issue a summons for a traffic violation involving the same vehicles. *Tr.* at 30, 44–45, 58–59.

Other facts elicited both at the hearing and in related cases support the conclusion that the search of Scopo's car was pretextual. In his testimony, Detective Higgins made clear that the primary purpose of the Colombo Strike Force was to engage in "active, aggressive law enforcement" in order to quell the violence of the Colombo "shooting war." *Tr.* at 27, 43–44, 57. A part of this mission

was to "take guns out of circulation whenever possible." *Tr.* at 44, 57. Team members knew that traffic stops of other suspected Colombo Family members during the "shooting war" had resulted in the seizures of illegal weapons. *Tr.* at 86–87; *see also People v. Edward DeMarco,* —— Misc.2d ——, NYLJ, June 15, 1992 (Kings Co. Sup.Ct., Juviler, J.) (detectives assigned to Colombo Strike Force used minor traffic infraction as illegal pretext to investigate driver and automobile, leading to seizure of gun).[9]

Information presented to this court in a separate action involving the very same "shooting war" between factions of the Colombo family, *United States v. Brady et al,* CR–92–0792, corroborates the pretextual nature of the search in *this* case. At side bar, the Assistant United States Attorney responsible for the *Brady* prosecution made the following statement:

> We discussed today . . . the FBI's strategy of alerting people when they were targets or hits. There was a strategy in place of a massive number of car stops. *If there were traffic infractions they would stop the car, they would search to see if they could develop probable cause.* There was a strategy of searching social clubs, all to get the weapons off the street. That was their goal.

Trial Transcript at 1925 (emphasis added).

█ In sum, based on testimony elicited at the suppression hearing coupled with the information presented above, this court finds that detectives on the Colombo Strike Force used Scopo's traffic violation as a pretext for their warrantless search of his automobile for weapons. While it is well established that an officer who has made a lawful custodial arrest of the occupant of an automobile may search the vehicle's passenger compartment incident to that arrest, where a court concludes that the *search* and not the arrest was the real purpose of the intrusion—" 'and that the arrest was a pretext for or at most an incident of the search' "—the search is unreasonable under the Fourth Amendment. *Caming,* 968 F.2d at 235 (*quoting Henderson v. United States,* 12 F.2d 528, 531 (4th Cir.

1926)); *see also United States v. Mota,* 982 F.2d 1384, 1386 (9th Cir.1993) (" 'An arrest may not be used as a pretext to search for evidence without a search warrant where one would ordinarily be required under the Fourth Amendment.' ") (*quoting Williams v. United States,* 418 F.2d 159, 161 (9th Cir.1969), *aff'd,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971)). The gun seized as a result of this unconstitutional search must be suppressed. Adopting the language of Judge Timbers in a recent civil forfeiture case, "[w]hile we recognize the formidable task faced by the government in its war on [organized crime], we decline to condone abuse of [the fourth amendment] as a means to winning that war." *United States v. $31,990 in United States Currency,* 982 F.2d 851, 856 (2d Cir.1993).

### CONCLUSION

For all the reasons stated above, this court concludes that the search of Scopo's car on January 17, 1992 was pretextual and therefore violated the fourth amendment's prohibition against unreasonable searches and seizures. Accordingly, as the contested physical and statement evidence were fruits of this unconstitutional behavior, defendant's motion to suppress is hereby granted.

SO ORDERED.

---

9. The detectives' aggressive arrest behavior and their mistaking Scopo for his brother are also informative. *Tr.* at 84–85.