### UNITED STATES of America

v.

**Jeremiah Keith CLARK, Defendant.**

**No. 92–CR–137S.**

United States District Court,
W.D. New York.

May 12, 1993.

Dennis C. Vacco, U.S. Atty., Buffalo, NY (John E. Rogowski, Asst. U.S. Atty., of Counsel), for Government.

Walsh & Sampson, P.C., Blasdell, NY (Daniel J. Chiacchia, of Counsel), for defendant.

## DECISION AND ORDER

### INTRODUCTION

SKRETNY, District Judge.

Presently before this Court are the government's objections to the Report and Recommendation of Hon. Leslie G. Foschio, United States Magistrate Judge for the Western District of New York, recommending that this Court grant defendant's motion to suppress certain physical evidence and statements made by defendant after arrest. For the reasons discussed below, this Court will adopt the Report and Recommendation of the Magistrate Judge in its entirety, and will grant defendant's motion to suppress.

### FACTS

The parties do not object to the factual findings contained in Magistrate Judge Foschio's Report and Recommendation. Therefore, this Court adopts those findings, and will not repeat them here.

On July 30, 1992, this Court entered a Referral Order referring all dispositive pretrial matters to Magistrate Judge Foschio for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B). On August 17, 1992 defendant filed his motion to suppress. Magistrate Judge Foschio filed a Report and Recommendation on March 11, 1993, and an

Amended Report and Recommendation ("R & R") on March 25, 1993.[1] Magistrate Judge Foschio found that the Lockport Police ("police") had illegally searched defendant in front of his house while executing a search warrant of the dwelling. Furthermore, Magistrate Judge Foschio determined that defendant had standing to challenge the stop of the vehicle in which he was a passenger at the time of his second arrest. He found that the stop of the vehicle was pretextual, and that evidence obtained in connection with defendant's second arrest must therefore be suppressed. In addition, Magistrate Judge Foschio determined that defendant's later arrest for cocaine possession was tainted by the earlier illegal arrest, and evidence and statements obtained in connection with the second arrest must therefore be suppressed as "fruit of the poisonous tree". Nonetheless, he found that defendant's statements made after his second arrest were voluntary and were not coerced; therefore, they would be admissible, were it not for the illegality of the second arrest. For these reasons, Magistrate Judge Foschio recommended that this Court grant defendant's motion to suppress the evidence and statements obtained during these arrests.

On March 26, 1993 the government filed its Objections to the Magistrate's Report and Recommendation Dated March 11, 1993 ("Objections"). On April 16, 1993 defendant filed a Response to the Government's Objections to the Magistrate's Report and Recommendation ("Response"). Although the government was afforded the opportunity to submit a reply, it did not do so.

### DISCUSSION

In its Objections, the government states that it does not contest Magistrate Judge Foschio's recommendation that the evidence obtained during the first search of defendant be suppressed, and that the defendant had standing to challenge the stop of the vehicle in which he was a passenger at the time of the second arrest (Objections, p. 2). The government objects to the following recom-

---

1. There are no substantive differences between the original Report and Recommendation and

the Amended Report and Recommendation.

mendations of Magistrate Judge Foschio: (1) that the evidence resulting from the second arrest of defendant should be suppressed as fruit of the poisonous tree; (2) that the evidence and statements obtained as a result of the second arrest should be suppressed because the stop of the vehicle was pretextual; and (3) that the evidence and statements obtained as a result of the second arrest should be suppressed because the second arrest was not justified by probable cause (see Objections, pp. 1–2).

*Fruit of the Poisonous Tree*

The basic law pertaining to this Fourth Amendment doctrine is fully set forth in the Amended Report and Recommendation (R & R, pp. 26–29). The government specifically contends that Magistrate Judge Foschio improperly considered the factors that determine whether the events surrounding the second arrest were sufficiently attenuated from those surrounding the first illegal arrest, so as to remove the taint of the first arrest.

The four factors to be considered are: (1) whether a *Miranda* warning was given; (2) the temporal proximity between the illegal act and the subsequent acts; (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *United States v. Oguns,* 921 F.2d 442, 447 (2d Cir.1990). First, the government argues that after the first arrest, defendant was Mirandized, and defendant made no statements to the police; nor was any evidence obtained by the police other than the packet of cocaine that was retrieved from defendant's coat (Objections, pp. 3–4). Second, the government argues that Magistrate Judge Foschio incorrectly concluded that there were no intervening circumstances to dissipate the illegality of the first arrest. The government argues that the defendant was fully processed, and was free to do as he pleased after release. Therefore, the government asserts, the second arrest was not "significantly directed" by the events surrounding the first arrest (Objections, p. 4, citing *United States v. Johns,* 891 F.2d 243, 245 (9th Cir.1989)). The government argues that the police were simply resuming their previous investigation of defendant, and that the results of the first arrest did not dictate the second arrest. Finally, the government

argues that no police misconduct was involved, and there would be no objective of deterrence furthered by suppressing the evidence and statements in question (Objections, pp. 6–7).

This Court holds that Magistrate Judge Foschio correctly applied the factors contained in *Oguns* to the facts of the present case. He presided over a lengthy suppression hearing, which lasted approximately five hours over three days of testimony. He heard testimony from the parties involved in the two arrests. During the hearing, he had the opportunity to observe the witnesses, and to ascertain their credibility. Magistrate Judge Foschio concluded that the first arrest led directly to the second arrest, and that the events surrounding the second arrest were not sufficiently attenuated from those surrounding the first arrest to remove the taint of illegality. Specifically, Magistrate Judge Foschio found that the arrests were separated by a period of only four hours, during most of which defendant was in custody, and that the second arrest was made "literally within minutes of [defendant's] release on the first arrest ..." (R & R, p. 30). He also noted that Detective Captain St. Onge "specifically directed the police to place continuous surveillance on Clark's vehicle with the intention of either pulling the vehicle over when Clark later retrieved it, or of impounding the vehicle after 2 a.m. when it became illegal, pursuant to a city ordinance, to park on city streets" (R & R, p. 31).

The clear import of St. Onge's testimony was that the surveillance was triggered by the finding of cocaine in defendant's coat during the first illegal search. St. Onge even testified that he most likely would not have ordered the surveillance and stop of the vehicle if he had not known of the illegally obtained evidence (see R & R, p. 32). This Court agrees that to suggest otherwise is "contrary to what is contained in the record" (R & R, p. 32).

Magistrate Judge Foschio also determined that there were "no intervening circumstances, such as Clark consenting to a subsequent search or making voluntary statements at the station house after his first arrest, or further criminal activity by Clark, leading to

the subsequent investigative activities directed against him" (R & R, p. 33).

These factors, as well as the other factors addressed by Magistrate Judge Foschio and not repeated here, lead to the inescapable conclusion that the finding of cocaine on defendant as a result of the first illegal search "significantly directed" the police to make the second arrest. Although defendant was the subject of an investigation, St. Onge admitted during the suppression hearing that he most likely ordered the vehicle to be watched and stopped, if justified, only because he knew that defendant had possessed cocaine on that evening. St. Onge had that knowledge only because he had earlier conducted an illegal search of defendant. The second arrest was not sufficiently attenuated from the first arrest to interrupt this chain of events.

In his Response, defendant correctly notes that the facts of the present case are similar to those in *United States v. Thomas,* 955 F.2d 207 (4th Cir.1992) (see Response, p. 5). In *Thomas,* the police suspected the defendant of drug activity, and conducted a warrantless and concededly illegal search of his hotel room, which he shared with a number of associates. The police found evidence linking the defendant to a recent bank robbery. The police, together with the FBI, began surveillance of the room, and interrogated defendant's associates, who consented to a search of their room. The police waited inside the room, and arrested defendant as he entered. Defendant was Mirandized, and he waived his rights. He signed a consent to a search of the room. The police searched the defendant's bag, and found tennis shoes matching the description of the robber given by bank employees. The defendant moved to suppress the evidence found in the room, arguing that it was tainted by the first illegal search.

The court held that, even though an intervening consent had been provided by the defendant, the second search of the room was tainted by the first, and the evidence obtained had to be suppressed as fruit of the poisonous tree.

In the present case, although defendant was previously suspected of drug activity, and the police had arranged one controlled "buy", the record shows that the police relied upon the results of the illegal search in continuing their investigation and stopping the vehicle only minutes after defendant had been released from the first arrest. Were it not for the finding of cocaine in defendant's coat, the police would not have arrested defendant, at least until they had successfully arranged a second "buy", in accordance with their standard policy. The events surrounding the second arrest were not merely "fortuitous", as the government claims (Objections, p. 5); rather, they " 'tended significantly' to direct the investigation toward the evidence in question." *Johns,* 891 F.2d at 245 (quoting *United States v. Bacall,* 443 F.2d 1050, 1056 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971) (other citations omitted)). For these reasons, defendant's motion to suppress will be granted.

*Pretext and Probable Cause*

■ This Court also adopts the findings and recommendations contained in the remainder of Magistrate Judge Foschio's Amended Report and Recommendation. Because this Court has already determined that the evidence and statements obtained as a result of the second arrest must be suppressed as fruit of the poisonous tree, it is not necessary to discuss in great detail the government's objections to Magistrate Judge Foschio's alternative bases for suppression, i.e., the pretextual stop of the vehicle, and the lack of probable cause justifying the second arrest.

The only point upon which this Court wishes to elaborate is that Magistrate Judge Foschio's conclusion that the traffic stop was pretextual is supported by the fact that the police decided to impound the vehicle, rather than simply issue a summons to the driver. The government argues that the police impounded the vehicle because this was standard police procedure where drug activity was suspected, and cocaine had been found at the scene (Objections, pp. 9–10). The government's argument is weakened by St. Onge's testimony that he directed the police to put defendant's vehicle under continuous surveillance, with the intention of pulling over the vehicle, or impounding it after 2:00

a.m., when it would be illegally parked. The police would then conduct an inventory search, the sole purpose of which, St. Onge testified, was to search the vehicle for narcotics. These facts make it clear that the police were looking for a way to search the car in a roundabout way, because they had no probable cause to support an application for a search warrant. Therefore, Magistrate Judge Foschio was correct in determining that the stop of the vehicle was pretextual.

## CONCLUSION

After carefully reviewing the record and the authorities cited by Magistrate Judge Foschio in his Amended Report and Recommendation, this Court will accept the findings and recommendations of Magistrate Judge Foschio in all respects, and will grant defendant's motion to suppress the evidence and statements obtained as a result of the first and second arrests.

## ORDER

IT HEREBY IS ORDERED that defendant's motion to suppress is GRANTED.

SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

This matter was referred to the undersigned by the Hon. William M. Skretny, on July 30, 1992, for disposition of all pretrial matters including report and recommendation on any dispositive motions. The matter is presently before the court on Defendant Clark's motion to suppress statements and physical evidence, filed August 17, 1992.

## BACKGROUND

Defendant Clark was indicted in a three count indictment, dated June 12, 1992, charging violations of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B), and 21 U.S.C. § 844(a). Specifically, Clark is charged with possession of cocaine and the unlawful possession of cocaine with intent to distribute.

Clark filed a motion to suppress statements and physical evidence on August 17, 1992. The motion also requested a court order granting certain discovery requests which, according to counsel relative to this matter, have since been resolved. See, Transcript of Suppression Hearing, dated October 27, 1992, at page 190–191. The Government responded to the suppression motion on September 11, 1992. A two-day evidentiary hearing on the motion was heard by the court on October 16, 1992 and October 27, 1992. The Government presented four witnesses, Officer Steven Ritchie, Detective Captain Jeffrey St. Onge, Lieutenant John Cross, and Officer Neil Livergood, each a member of the City of Lockport, New York Police Department. The defense did not present any witnesses. Three exhibits were entered into evidence: Defendant's Exhibit A, a drawing of the cocaine packet at issue, Government's Exhibit 1, the search warrant, and Government's Exhibit 2B, a photograph.

Following the hearing, Clark submitted a memorandum of law on December 3, 1992. The Government filed its memorandum of law on December 11, 1992. Oral argument on the matter was held on December 22, 1992, at which time the motion was deemed submitted.

For the reasons as set forth below, Clark's motion to suppress statements and physical evidence should be GRANTED.

## FACTS

On March 2, 1992, a search warrant was issued to search the premises of 275 Genesee Street, Lockport, New York. (T.I. 4–5).[1] The warrant authorized the search of the premises of "Upstairs Apartment, Number Seven" for cocaine and other controlled substances, drug paraphernalia, and records demonstrating drug sales. There was no authorization to search any identified persons and the application provided no probable cause as to any such individuals. See, Government Exhibit 1. Apartment One in the same building was also searched pursuant to the landlord's consent. (T.I. 52). The war-

---

1. T.I. references are to the page number of Volume I of the record of the suppression hearing, dated October 16, 1992.

rant was executed on March 4, 1992 at about 8 p.m. by City of Lockport police, including Officer Steven Ritchie. (T.I. 4–6).

As Officer Ritchie exited the building, he observed Defendant Clark on the sidewalk within the boundaries of the property at 275 Genesee Street. (T.I. 8–10). Clark left ·a crowd of bystanders who had gathered in front of the property and began to walk towards Ritchie. (T.I. 11–12, 58). Ritchie asked Clark what he was doing, to which Clark replied in a sarcastic tone that he was just "walking." (T.I. 12). Ritchie proceeded to take Clark over to one of the police cars parked on the street, had Clark put his hands on top of the car, and patted him down in a check for weapons. (T.I. 12). No weapons were found. (T.I. 12). Ritchie then asked Clark for identification; Clark immediately complied. (T.I. 13).

Detective Captain St. Onge was standing on the other side of the police car while Ritchie was speaking with Clark. (T.I. 14). After Clark produced his identification, Ritchie asked St. Onge if he wanted to speak with Clark. (T.I. 14). St. Onge approached Clark, asked Ritchie if he had been searched for weapons, and, even though Ritchie indicated that Clark had already been searched, proceeded to again search Clark.[2] (T.I. 15, 59–60). St. Onge, however, did not limit his search to a pat down, but, rather, thrust his hand inside Clark's coat pocket and discovered a small plastic bag containing two white chunks of substance.[3] (T.I. 15). Clark immediately accused St. Onge of planting the

substance in his pocket. (T.I. 15, 62). Clark was arrested and transported to the police station, charged with criminal possession of a controlled substance. (T.I. 17–18).

Prior to taking Clark to the station, St. Onge gave instructions over the police radio to locate a 1984 Renault which Clark had been driving during the earlier controlled buy. (T.I. 63). When St. Onge was subsequently informed. that the vehicle had been located, parked on a city street approximately one block away from 275 Genesee Street, he left directions to conduct continual visual surveillance of the vehicle in the event anyone went back to the vehicle, and, if not, to impound the vehicle after 2 a.m. as it was illegal to park on a city street after 2 a.m. At that time, an inventory search of the vehicle would be conducted "for the purposes of finding whatever might be in that vehicle." (T. 64–65). Officers Jurasz and Livergood of the City of Lockport Police Department conducted the surveillance of the car. (T.II. 133–134).[4]

Clark posted bail and was released from the Lockport jail at midnight on March 5, 1992. (T.I. 65). Shortly thereafter, Officer Jurasz reported over the police radio that a vehicle, a 1980 Chevrolet, had pulled up alongside the Renault she was surveilling, that a male passenger had gotten out of the vehicle, entered the driver's side of the Renault, then exited the Renault and returned to the first vehicle. (T.II. 138–139). She then reported that a female had exited the

---

**2.** At the hearing, St. Onge stated that he was familiar with Clark as, at the time of this encounter, he was involved in a narcotics investigation of Clark through the use of a confidential informant. (T.I. 41). Using the confidential informant, St. Onge had allegedly conducted a controlled buy of cocaine from Clark sometime between March 1, 1992 and March 4, 1992. (T.I. 44–45). St. Onge had observed the controlled buy, and watched Clark pull the suspected cocaine from the inside pocket of his coat. (T.I. 46). Clark, however, was ·not arrested as St. Onge stated that his department's policy is to make two controlled buys from an individual before obtaining a search warrant or an arrest warrant from a Niagara County court. (T.I. 49). When St. Onge conducted the pat down of Clark outside of 275 Genesee Street, he recognized the coat which Clark was wearing as being·the same coat that Clark wore when the controlled buy had been made earlier. (T.I. 60–61).

**3.** St. Onge asserted at the hearing that the search of Clark's inside pocket was authorized pursuant to the search warrant for 275 Genesee Street as Clark was standing on the premises at the time. (T.I. 106). He conceded that no other exceptions to the Fourth Amendment requirement that a search warrant be obtained before a search of a person is conducted applied to the search of Clark's jacket. (T.I. 106). The Government also concedes that the search went beyond the authority of *Terry v. Ohio*, but claims, contrary to St. Onge's testimony, that the warrantless search of Clark was justified under the exigent circumstances exception to the warrant requirement. See, Government's Memorandum of Law at page 12. The court notes that the Government does not rely on St. Onge's justification for the search.

**4.** T.II. references are to the page number of Volume II of the suppression hearing transcript, dated October 27, 1992.

Chevrolet, entered into the Renault, and that both vehicles began to drive away together. Livergood was informed that the male passenger had reentered the Chevrolet prior to that vehicle pulling away from the Renault. (T.II. 138). (T.II. 139). At that point, there was no indication that, the Renault, Clark's vehicle, was believed to also contain contraband. Following the vehicles for approximately one quarter of a city block, Officer Jurasz pulled over the Renault on suspicion of equipment violations (T.II. 181); Officer Livergood stopped the Chevrolet after that vehicle was observed making a right hand turn without a signal. (T.II. 141). At that time, Livergood could only see the female driver in the Chevrolet, but as the car was pulled over, a person "popped up" on the passenger side of the vehicle. (T.II. 142). This person was later ascertained to be Defendant Clark. (T.II. 143). Upon seeing the individual "pop up" inside the vehicle, Livergood called for assistance, and Lockport Police Officer Colbey arrived on the scene within minutes. (T.II. 145).

Just prior to Colbey's arrival, Clark began to exit the vehicle, but Livergood immediately ordered him back into the car. (T.II. 146). When Colbey arrived, he approached the driver's side of the Chevrolet, while Livergood walked over towards the passenger side. (T.II. 147). Livergood checked the area next to the car between the curb and the sidewalk, looking for drugs that may have been thrown out of the vehicle. (T.II. 147). Finding none, he then returned to his patrol car and radioed-in the vehicle's registration information. (T.II. 148). Upon learning that the vehicle's registration was valid, Livergood again approached the passenger side of the vehicle, and rechecked the area outside the vehicle for drugs. (T.II. 149). Unlike his first inspection, Livergood proceeded to search underneath the car with a flashlight. (T.II. 149). Livergood discovered a plastic "baggie" underneath the car which contained a substance the officer believed, based upon its appearance and wrapping, to be illegal drugs. (T.II. 149). Without any further analysis of the substance,

Livergood then arrested Clark for narcotics possession. (T.II. 150). A brief struggle ensued, after which Clark was put in the patrol vehicle, read his *Miranda* warnings by the officers, and again taken to the police station. (T.II. 150–151). Clark was not questioned in the vehicle. (T.II. 152). The two females who were driving the Renault and the Chevrolet were also taken into custody for the alleged vehicle and traffic violations, rather than being given standard summonses and released at the scene. (T.II. 153). According to Officer Livergood, the arrests of the females were made "because of the drugs." (T.II. 154). The record indicates, however, that the women were never charged with any drug offenses, but only for vehicle and traffic violations. (T.II. 154, 178).

Clark was separated from his companions at police headquarters. (T.II. 153). His Renault was impounded as, according to St. Onge, it is the normal procedure of the Lockport Police Department to impound vehicles for traffic infractions when drugs are suspected in order to subject the vehicle to an inventory search.[5] (T.I. 97–98).

Upon arrival at the station, Livergood was joined by Desk Lieutenant Cross, whereupon Clark offered to give a statement in exchange for not involving his two female companions in the investigation. (T.II. 152–153). Clark was taken into a room and given his *Miranda* warnings for a second time by Officer Livergood. (T.I. 113). Clark indicated to Livergood that he understood his rights. (T.I. 114). Clark then complained that the police had broken into his Renault and stolen $2500 in cash from the car. (T.II. 155). He further stated that he knew the police had taken the money, because if his friends had broken into the car, they would have taken the money and the drugs which Clark stated were also in the vehicle. (T.II. 155). Clark then offered to make a formal statement, and was handed a form to use in writing his statement on which the Miranda warnings were imprinted. (T.II. 156). After reading the form, Clark indicated that he wished to speak with counsel before he gave a written

---

5. St. Onge went off-duty at approximately 10:30 p.m., but, consistent with his prior direction to all patrol officers to maintain constant surveillance of Clark's vehicle which had been discovered about one block from 275 Genesee Street, where the search warrant had been executed, (T.I. 64), he was kept advised by the desk officer of all developments. (T.I. 65).

statement and the interview was terminated. (T.II. 156).

Clark was then taken from the room and brought to the booking area, a short distance away, at which point Detective Captain St. Onge, who had been advised of Clark's arrest, arrived. (T.II. 156). St. Onge did not speak to Clark directly, but spoke with the other officers in the room about Clark while Clark was in the same room and within earshot. (T.I. 118). Clark then accused St. Onge of stealing the $2500, to which St. Onge replied, "I suppose you're going to say I planted that crack there, too." (T.I. 68, T.II. 156). Clark then responded, "no, that was there. I'm talking about my $2500, you took my $2500." (T.I. 68). At the time of this encounter, St. Onge was aware that Clark had previously invoked his right to counsel. (T.I. 118).

## DISCUSSION

■ Under the standard as established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a limited investigative stop of an individual may be made if it is based on a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting, *Terry, supra*, 392 U.S. at 30, 88 S.Ct. at 1884). The standard for determining whether a particular stop is justified by reasonable suspicion is an objective one and is not based upon the subjective views of the detaining officer. See, *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

■ In this case, both the Government and Clark agree that Officer Ritchie's initial stop of Clark outside of the premises of 275 Genesee Street was justified under *Terry*. However, Clark argues that the subsequent actions of St. Onge in front of 275 Genesee

Street violated his rights under the Fourth Amendment. Additionally, Clark claims that, after his release on bail, the stop of the vehicle in which he was a passenger was pretextual and a further violation of the Fourth Amendment, and was only made based upon the officers' use of the information that drugs had been seized from Clark earlier during the allegedly illegal search conducted by St. Onge at 275 Genesee Street. Finally, Clark contends that the statements which were made at the police station after his second arrest were obtained in violation of his Fifth Amendment rights as, at the time the statements were made, he had already invoked his right to counsel.[6]

The Government, in its response, concedes that when St. Onge searched Clark's coat pocket he went beyond the permissible scope of *Terry*. However, the Government argues that St. Onge's search of Clark was supported by probable cause, as, in the circumstances of this particular case, *i.e.*, that, at the time of St. Onge's search of Clark, a search was being executed at a location where drug deals had previously taken place, and that St. Onge had recently conducted a controlled buy of drugs from Clark,[7] exigent circumstances were present justifying the warrantless search of Clark. Additionally, the Government claims that the later stop of the vehicle in which Clark was riding was not pretextual as there is no evidence that the stop of the vehicle would not have been made in the absence of an impermissible purpose. Alternatively, the Government contends that the vehicle stop was justified under *Terry*. The Government also claims that the cocaine found under the car was abandoned by Clark, and therefore, its seizure did not violate any of Clark's constitutional rights. Finally, the Government contends that Clark's statements at the police station following his second arrest were spontaneous and voluntary and were otherwise obtained without

---

6. Although Clark did not argue in his memorandum or at oral argument that the "fruit of the poisonous tree" doctrine applies to the statements he made at the police station following his second arrest, the court finds that the doctrine should be applied to this evidence as well as the physical evidence in determining whether any of the evidence should be suppressed. See, *e.g.*, *United States v. International Business Machines*, 475 F.Supp. 1372, 1382 (S.D.N.Y.1979) (courts

have a duty to raise matters *sua sponte* when evidence indicates that an action should take a particular turn).

7. The court notes that the previous controlled buy of alleged cocaine from Clark took place at a different location than 275 Genesee Street, the subject of the search warrant executed on March 4, 1992. (T.I. 76).

any violation of Clark's rights under *Miranda v. Arizona.*

### 1. The Search Outside of 275 Genesee Street

█ Under *Terry*, an officer may conduct a limited protective search for weapons where, during a justified investigatory stop, he reasonably believes that the individual he is searching is armed and dangerous to the officers or to others. *Terry, supra,* 392 U.S. at 24, 88 S.Ct. at 1881. In *Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968), the Court stated that a search for weapons "consists solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *United States v. Terry,* 718 F.Supp. 1181 (S.D.N.Y.1989), *aff'd,* 927 F.2d 593 (2d Cir.1991) (quoting, *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)).

As indicated above, the Government and Clark agree that the initial pat-down of Clark by Officer Ritchie was justified under *Terry v. Ohio.* The issue then is whether the subsequent pat-down of Clark by Detective St. Onge immediately following Ritchie's pat-down of Clark, and the additional search into Clark's inside coat pocket by St. Onge during the second pat down were permissible. Clark argues that the search into his coat pocket and the resulting seizure of cocaine were illegal. The Government responds that, under the circumstances of this case, St. Onge did not violate Clark's Fourth Amendment rights by searching inside his coat.

The Government concedes that St. Onge's search of Clark went beyond the scope of *Terry v. Ohio,* but argues that the search was based on probable cause, and therefore, the search was proper. The Second Circuit has held that a search which is more intrusive than a *Terry* search is tantamount to a warrantless arrest and must be based upon probable cause. See, *United States v. Ceballos,* 654 F.2d 177, 182 (2d Cir.1981); *United*

States v. Terry, supra, at 1186. See also, *United States v. Vasquez,* 612 F.2d 1338, 1345 (2d Cir.1979), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980) (a maximal intrusion, even if technically short of an arrest, must be based on probable cause). Probable cause exists where "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979).

In *United States v. Terry,* the court held that a search by a police officer in which the officer opened the defendant's jacket, observed a bulge, and reached under the defendant's sweatshirt, removing a brown paper bag containing narcotics was supported by probable cause where the defendant had been observed at a location suspected of being used for narcotics sales immediately prior to the stop, had engaged in evasive driving after leaving that location, and the driver of the vehicle in which defendant was riding gave the police a false statement as to their whereabouts immediately prior to the stop of the vehicle. The court specifically noted, however, that "a brief presence at a location suspected to be used for the sale of narcotics and possession of a brown paper bag by a person of the same description as the suspected purchasers *[would] not [in itself]* constitute probable cause," but rather, the evasive driving and false statement, in conjunction with the presence at the suspect location, led to the court's determination of probable cause. *United States v. Terry, supra,* at 1186 (emphasis added) (distinguishing *United States v. Ceballos,* 654 F.2d 177 (2d Cir.1981)).

█ In this case, the court concludes that Detective Captain St. Onge's search of Clark's inside coat pocket was not supported by probable cause. Clark had not been observed going into or coming from the location which was being searched, but was only outside the premises standing in an area occupied by on-lookers from the neighborhood.[8]

**8.** Although Clark has conceded that the initial stop by Officer Ritchie was proper under *Terry v.*

*Ohio,* it is not entirely clear on this record that Ritchie had sufficient reasonable suspicion for

He was not the subject of the search warrant directed to the premises at 275 Genesee Street as no individuals were described in the warrant or in the supporting application. The only basis on which St. Onge reached into Clark's pocket during the instant search was that St. Onge had previously conducted a controlled buy of narcotics, apparently two days earlier, (T. 77), during which Clark was wearing the same coat and where the drugs Clark was allegedly selling on that occasion were observed by St. Onge to have been stored in his inner coat pocket.[9] The court finds that this, in itself, does not rise to the level of probable cause required to determine that the search was proper under relevant case law. See, *e.g., United States v. Rodriguez,* 750 F.Supp. 1272, 1275 (W.D.N.C.1990), *aff'd,* 972 F.2d 343 (4th Cir.1992) (court held officer's conduct improper where the officer reached directly into the defendant's pocket "knowing full well that no weapon was there ... [the officer] believed the lump [in defendant's pocket] to be cocaine and intended to retrieve it"—cocaine admissible, however, as it would have been inevitably seized following defendant's valid warrantless arrest); *United States v. Rivera,* 738 F.Supp. 1208 (N.D.Ind. 1990) (motion to suppress granted where officer reached into defendant's pocket solely to retrieve contraband). Moreover, there was no indication in St. Onge's testimony that he had received any later trustworthy information connecting Clark with narcotics possession on March 4, 1992. The fact that he was, at the time of the search, on a public sidewalk near a house where a search warrant for possible narcotics had been executed does not alter this conclusion, absent any indication directly associating him with criminal activity in the house.

In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), officers equipped with a search warrant authorizing a search of a tavern and its bartender for narcotics entered the tavern and proceeded to pat down the tavern's patrons for weapons. Subsequently, after noticing what felt like a cigarette pack, one officer reached into the defendant's pocket and retrieved packets containing heroin. The Court held that the search and seizure of the defendant contravened the Fourth Amendment as, regardless of the fact that the officers possessed a valid search warrant to search the tavern and its bartender, the defendant was not named as a target in the warrant, and, therefore, there was no probable cause to search the defendant. The Court stated that:

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another *or to search the premises where the person may happen to be.*

*Ybarra, supra,* at 91, 100 S.Ct. at 342 (emphasis added).

■ As it has already been determined above that St. Onge did not have probable cause to search inside Clark's coat pocket, there can be no reliance on the fact that Clark was on the premises where a valid search warrant was being executed.[10] See also, *United States v. Sporleder,* 635 F.2d 809 (10th Cir.1980) (search of defendant's pockets not justified by search warrant authorizing search of premises). Accordingly, the court finds that Detective St. Onge impermissibly reached into Clark's coat pocket, thereby violating Clark's Fourth Amendment rights, and that the evidence discovered therein, *i.e.,* the cocaine, should be suppressed.

■ The Government, nonetheless, argues that, based upon *United States v. Graham,* 563 F.Supp. 149 (W.D.N.Y.1983), this court should find that "exigent circumstances" existed which justified St. Onge's

his decision to stop and frisk Clark. See, *United States v. Terry, supra.*

9. The location of the earlier drug transaction with Clark was not revealed, but, apparently, did not take place at 275 Genesee Street.

10. This analysis assumes that Clark was on or within the premises described in the warrant.

However, the description given in the warrant was clearly limited to the dwelling itself, and Clark was stopped and searched on the public sidewalk some distance outside the building. See, Exhibit 1. Further, the probable cause statement in the warrant's application was similarly limited to the interior of the dwelling. See, Exhibit 1, pp. 2–3.

warrantless search of Clark. This argument is wholly unpersuasive. Exigent circumstances arise when a reasonable officer could believe that to delay acting to obtain a warrant would, in all likelihood, permanently frustrate an important law enforcement objective, such as to prevent the destruction of evidence relating to criminal activity or to secure an arrest before a suspect can commit further serious harm. See, *United States v. Rengifo,* 858 F.2d 800, 805 (1st Cir.), *cert. denied,* 490 U.S. 1023, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1988). See also, *United States v. Paz,* 756 F.Supp. 744, 747 (S.D.N.Y.1990) (exigent circumstances exception attaches if suspect is about to flee, evidence is about to be destroyed, or life is about to be threatened). The determination of exigent circumstances is an objective one based on the totality of the circumstances confronting law enforcement agents at the time of the action taken. See, *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).

In *Graham, supra,* the defendant committed an armed bank robbery and then returned to his apartment which was located in a building containing two apartments, upper and lower. The court found that probable cause existed to search without a warrant any persons on the premises of the apartment building as the defendant had indicated his intention to hide the robbery proceeds from the police, defendant had been in both apartments in the building following the robbery, the persons in the apartments were friends or relatives of the defendant, the occupant of the upper apartment had lied to the police about the defendant's presence in the lower apartment, and the discovery of a weapon in the lower apartment strongly suggested that the robbery proceeds were also in the building, and stolen money is easily concealable on a person. Although presented with these arguably exigent circumstances, the court carefully noted that situations in which justification exists to search a person without a warrant "are not to be lightly inferred" and can be described as constituting "a few specifically established and well-delineated exceptions" to the warrant requirement. *Graham, supra,* at 151

(quoting, *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)).

The factors leading to the decision in *Graham* are simply not present in this case. As described above, the fact that St. Onge had begun an investigation of Clark and observed Clark selling narcotics, at least two days prior to the instant search, in no way creates reasonably trustworthy information constituting sufficiently exigent circumstances to justify a warrantless search of Clark. The substantial time lapse, as well as the apparent difference in locale, supports this conclusion. There was, moreover, no evidence that Clark had been continuously observed in narcotics trafficking. The clear absence of probable cause renders the exigent circumstance exception inappropriate to this case. A fair reading of *Graham* does not require any different result. See also, *United States v. Rivera, supra* (no probable cause to search defendant's pocket without a warrant where defendant simply pulled into his driveway in his vehicle during a search of his residence and officer had already dispelled any reasonable suspicion that defendant was armed).

Additionally, although the Government does not raise this argument, it should be noted that St. Onge's purpose in repeating the stop and frisk of Clark after Officer Ritchie's initial pat-down was not for the purpose of arresting Clark for the alleged prior narcotics sale, which apparently occurred on March 2, 1992, and for which he was not charged. (T.I. 60, 63). While a controlled purchase of narcotics by an police officer "is a recognized and permissible means of investigation," employed to gather evidence of illegal conduct and to make lawful arrests, (see, *MacDonald, supra,* at 771), as determined above, no exigent circumstances existed at the time of the search for St. Onge to make a warrantless arrest of Clark based on the prior sale two days earlier. *Cf. MacDonald, supra,* at 771 (agents did not need warrant to reenter apartment and make arrests where officer had made controlled purchase of narcotics ten minutes earlier and agents were informed that suspects were fleeing through a bathroom window). St. Onge's sole purpose in conducting a second pat-down of Clark was to search

him for narcotics based upon the suspicion that, since he had possessed narcotics two days before, he must still have been in possession of narcotics at the time of his search on March 4, 1992. (T.I. 60). According to the Government, it had been St. Onge's plan to gather more evidence, sufficient to obtain a search warrant for Clark and his residence. See, Government Memorandum of Law, at page 4. Upon confronting Clark unexpectedly two days later, St. Onge evidently decided to accelerate the investigation. If St. Onge had intended to arrest Clark based on the prior alleged sale, he had ample opportunity to make an application for an arrest warrant. He did not do so, and expressly stated that, at that point he had no intention to do so as it was his department's policy not to make such an application for a warrant until after a second successful controlled buy. Based on the facts, it is clear to this court that no probable cause existed for the warrantless search of Clark on March 4, 1992 because of his alleged prior sale days earlier, and, further, no exigent circumstances existed to justify either a warrantless search of Clark or his arrest without a warrant on that date.

### 2. *Standing to Challenge the Vehicle Stop*

To mount a successful challenge to a search of a vehicle, a defendant must show a legitimate basis for being in the vehicle, such as permission from the owner. See, *United States v. Ponce,* 947 F.2d 646, 649 (2d Cir.1991); *United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). Under *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979), a defendant must establish that he has a property or possessory interest in the place searched or the items seized, along with a legitimate expectation of privacy in the place searched and the items seized. See, *Rakas, supra,* at 148, 99 S.Ct. at 433 (passengers in vehicle who asserted neither a property nor a possessory interest in the vehicle searched nor an interest in the property seized and showed no legitimate expectation of privacy, were not entitled to challenge search of vehicle). See, also, *United States v. Paulino,* 850 F.2d 93 (2d Cir.1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989) (backseat passenger had no legitimate expec-

tation of privacy where he had no control over the car interior and no right to exclude others from the vehicle, and therefore, showed no standing to challenge search). *Rakas,* while conclusive on the issue of who has standing to challenge the search of a vehicle, did not decide the issue as to whether a passenger has standing to challenge the initial stop of a vehicle.

In challenging the stop of a vehicle, a defendant is objecting to the seizure of his person as violative of the Fourth Amendment. *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). "Stopping a vehicle and detaining its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). Although the Second Circuit has not yet ruled on this issue, other courts have held that a passenger in a vehicle, even if not able to challenge the search of the vehicle, may have standing to challenge the illegal stop of a vehicle. See, *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989) (passenger in vehicle had standing to challenge a traffic stop as "drivers and passengers have similar interests in seeing that their persons remain free from unreasonable seizure"); *United States v. Portwood,* 857 F.2d 1221 (8th Cir.1988), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989) (passenger in vehicle had standing under the Fourth Amendment to challenge the legality of the stop of the vehicle); *United States v. Lawson,* 782 F.Supp. 1546, 1548 (S.D.Fla.1992) (defendant, a passenger in the vehicle, had standing to challenge traffic stop of automobile as pretextual as the stop "implicate[d] an interest of [the] defendant that the Fourth Amendment was designed to protect"). See also, *United States v. Powell,* 929 F.2d 1190, 1195 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991) (court noted that numerous state courts and a federal appeals court have concluded that passengers have standing under the Fourth Amendment to challenge an illegal traffic stop).

This court finds the above precedent persuasive. In this case, Clark is seeking to challenge as pretextual the stop of the vehicle in which he was a passenger. As a result of the stop, Clark was seized, searched, and re-arrested. Clark's Fourth Amendment rights, freedom of movement without unreasonable seizures, were clearly implicated by the stop. Both Clark and the female drivers of the two stopped automobiles were seized as a result of the stops, arrested, and brought to the police station. In *Erwin*, the court stated that "it is beyond dispute that a vehicle's driver may challenge his traffic stop, and we see no reason why a person's Fourth Amendment interests in challenging his own seizure should be diminished merely because he was a passenger." *Erwin, supra,* at 270. The court adopts this reasoning, and finds that Clark has standing to challenge the stop of the vehicle in which he was a passenger.

### 3. *Stop of Vehicle was Pretextual*

The Second Circuit has not established a clear test in determining when a traffic stop is pretextual and therefore unable to provide any legal basis for incidental searches or seizures. In *United States v. Millio*, 588 F.Supp. 45 (W.D.N.Y.1984), the court found a vehicle stop for a traffic infraction pretextual where the police were waiting for an opportunity to stop the vehicle in order to search the defendant/driver and the vehicle for a weapon. After following the vehicle, the officers suspected that the defendant was intoxicated; after turning on their flashing lights, they noticed that defendant's windshield was cracked. Despite the fact that the defendant passed a sobriety test, the officers repeatedly peered into the vehicle with a flashlight and discovered the sought-after weapon. The court ordered the evidence suppressed. In *United States v. Cook*, 1991 WL 190564 (S.D.N.Y.1991), the court denied the defendant's suppression motion, holding that a traffic stop is permitted where there is probable cause to believe that a traffic offense has been committed and where a reasonable officer would have made the stop even without suspicion of other offenses. The court found the police officer credible when he described the defendant's driving as erratic, and, despite the fact that the decision to follow the vehicle stemmed from an earlier narcotics trafficking surveillance, held the stop to be legitimate and nominally intrusive. However, the facts in *Cook* established that the defendant had been observed ten minutes prior to the vehicle stop leaving a house, well-known for its use as a place to sell drugs, with a paper bag and in the company of a known narcotics trafficker, that the defendant had entered a double-parked vehicle in front of the house and had driven away with another known drug dealer. The defendant had also been under investigation for narcotics trafficking for over two months, and had been arrested during the past year in an automobile containing drugs. These facts strongly distinguish *Cook* and its analysis from the instant case, and suggest that the stop of the Chevrolet was a pretext to search.

Two different tests have been developed by other circuits in determining whether a stop was pretextual. One test requires that, in the context of a traffic stop, an objective analysis of the usual and ordinary procedures must be made, and the court determines whether a reasonable officer would have made the stop in the absence of the invalid purpose. See, *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988); *United States v. Smith,* 799 F.2d 704 (11th Cir.1986). A second contrary test holds that an investigative stop is justified if an officer is legally entitled to make the stop. See, *United States v. Cummins,* 920 F.2d 498 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 449 (1991); *United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991). The *Millio* case appears to apply the first test, and this court concludes, in the absence of clear authority from the Second Circuit, that the reasoning of *Millio* should be applied in the instant case.

In this case, based on the testimony of the officers during the hearing, the court finds that the traffic stop of the 1980 Chevrolet in which Clark was riding, following his release from custody, was pretextual. Officer Livergood, who pulled over the Chevrolet, stated that there were occasions when he observed cars make turns without giving a turn signal

and no citation was given, but that on this particular occasion he decided to pursue the vehicle to give it a ticket. (T.II. 161). The officer was under direction to observe the vehicle and "to follow it, stop it if there's cause to stop it." (T.I. 94). In addition, when the car was pulled over, not only was the driver given a ticket after being taken into custody, but the car was impounded and towed to the police station. (T.II. 161). Testimony revealed that it was Lockport police policy to impound vehicles for traffic infractions when drugs are suspected. (T.I. 97). However, at the time of the stop, neither Officer Juracz or Officer Livergood had any reasonable basis for believing that there were drugs either in the Renault or in the Chevrolet. Nothing in the record established that either officer saw Clark remove drugs from the Renault and put them in the Chevrolet. Further, the stop took place in a residential area, after midnight when traffic was light, if not non-existent, (T.II. 162), the driver was not operating the vehicle in an unsafe manner and was within a short distance from the place were Clark entered his Renault and reentered the Chevy. Although Officer Livergood appeared to be a credible witness, the facts of this phase of the investigation do raise serious questions as to whether there was any such violation. The record does not indicate how the summonses issued to the two women were ultimately adjudicated, but this would not, for the reasons discussed, require a contrary conclusion. Given the facts developed at the hearing, the court concludes that the stop of the vehicle was pretextual to allow the officers to search in and around the vehicle for drugs. The suppression of the physical evidence and statements found as a result of this illegal stop will be discussed in the next section of this Report and Recommendation.

### 4. Fruit of the poisonous tree doctrine

Clark argues that the discovery of the alleged cocaine underneath the car in which he was a passenger, and the two statements which he made at the police station following his second arrest should be suppressed under the fruit of the poisonous tree doctrine, as, but for the illegal search of him in front of 275 Genesee Street, the suspected cocaine in his pocket would not have been discovered

and his vehicle would not have been under surveillance, and, therefore, the subsequent acts of the police, *i.e.*, stopping the vehicle in which he was a passenger, discovering cocaine under the car, re-arresting him, together with his subsequent questioning, would not have occurred.

Under the fruit of the poisonous tree doctrine, evidence acquired directly or indirectly as a result of an illegal search or arrest will be excluded. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, a defendant's intervening act of free will can break the causal chain between the tainted evidence and the illegal police conduct which violates the Fourth Amendment. *Wong Sun, supra,* at 487, 83 S.Ct. at 417. Not all evidence is fruit of the poisonous tree and thereby subject to suppression under the requirements of the exclusionary rule merely because it would not have come to light but for the illegal actions of the police. Rather, the question is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Alvarez–Porras*, 643 F.2d 54, 59 (2d Cir. 1981), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981) (quoting, *Wong Sun, supra,* 371 U.S. at 487–88, 83 S.Ct. at 417–18). Also, "whether the unlawful police behavior bore a causal relationship to the acquisition of the challenged [evidence]" is a primary question. *United States v. Crews*, 445 U.S. 463, 469, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). The purpose of the exclusionary rule, of which the fruit of the poisonous tree doctrine is a part, is to deter police misconduct and safeguard the integrity of the judicial process. *Wong Sun, supra,* 371 U.S. at 486, 83 S.Ct. at 416; *Alvarez–Porras, supra,* at 59. The exclusionary rule is meant to put the government in the same position it would occupy had the police misconduct not occurred. *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). The government bears the burden of proving that the taint has been alleviated. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416

(1975); *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987).

■ There are three exceptions to the fruit of the poisonous tree doctrine. *Alvarez–Porras, supra,* at 59–60. The "independent source" rule states that knowledge gained from an independent source may be used even if the knowledge was also obtained from an illegal source. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The exclusionary rule is limited to evidence which police can not trace to some "independent" and lawful source. *United .States v. Marchand,* 564 F.2d 983, 993 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, .54 L.Ed.2d 760 (1978) (quoting *James v. United States,* 418 F.2d 1150, 1151–52 (D.C.Cir.1969)). A violation of the Fourth Amendment should not require exclusion of evidence that was obtainable without the illegal act. *Marchand, supra,* at 994–995. However, evidence cannot be admitted under the independent source rule if the law enforcement official's decision to take further action was prompted by what the official had observed or seized during the initial unlawful act. *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988).

■ Under the "inevitable discovery" rule, evidence which would have been discovered independently of any constitutional violation will not be suppressed. See, *Nix v. Williams, supra.* The inevitable discovery rule permits evidence to be admitted, even though it was obtained unlawfully, when the government can show that discovery of the evidence by lawful means was inevitable. *United States v. Gorski,* 852 F.2d 692 (2d Cir.1988) (inevitable discovery rule not applied to suppress evidence found during inventory search of bag where court found that no evidence revealed that the FBI always conducted inventory searches during routine booking procedures). The inevitable discovery exception applies to direct as well as indirect products of the government's illegal search. *United States v. Pimentel,* 810 F.2d 366, 368 (2d Cir.1987).

Finally, where the causal relationship between the illegal act and the discovery of the evidence is sufficiently attenuated so as to render the evidence admissible, a motion to suppress will be denied. See, *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Four factors may be considered when assessing whether the taint of the initial illegal act was sufficiently attenuated to avoid application of this rule: (1) whether a *Miranda* warning was given, (2) the ·temporal proximity between the illegal act and the subsequent acts, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *United States v. Oguns,* 921 F.2d 442, 447 (2d Cir.1990); *Ceballos, supra,* at 50.

In *Oguns,* agents, after conducting a legal security sweep of the defendant's apartment, illegally entered the apartment a second time without a warrant. Before a warrant was obtained, the defendant consented to a search. The defendant then moved to suppress the evidence uncovered during the search, claiming that the evidence was the fruit of the illegal entry. Using the factors as stated above, the court found that the illegal entry was dissipated and the evidence was not suppressed, as the defendant was provided his *Miranda* warnings, with a pause between each warning to ask if he understood, he was also handed a consent to search form to read which went into even more details about his Fourth Amendment rights, there was no search and seizure until after the consent form was read and signed, and the conduct by the law enforcement officers was not flagrantly illegal or conducted in bad faith. *Oguns, supra,* at 447. While there was only a short proximity in time, *i.e.,* a few minutes, between the time of the illegal entry and the subsequent consent to search, the court held that the other factors sufficiently attenuated the initial illegal entry.

In contrast, in *United States v. Johns,* 891 F.2d 243 (9th Cir.1989), police officers determined the identification of the defendant as a result of an illegal stop. Based on this identification, the officers began surveillance of the house of a known associate of the defendant, which subsequently led to the discovery of marijuana. The court, in determining that the drugs which were discovered should be suppressed, held that the illegally obtained identification significantly directed the subsequent investigation which then led "quickly"

to the discovery of the marijuana. The court concluded that the illegal stop was the impetus for the subsequent chain of events, and was too closely and inextricably linked to the discovery of the marijuana for the taint to have dissipated. *Johns, supra,* at 244–245. In so holding, the court stated that the appropriate test for such a scenario is whether the illegal activity tended to "significantly direct" the investigation to the evidence in question. *Johns, supra,* at 245 (citing, *United States v. Bacall,* 443 F.2d 1050, 1057 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971)).

In this case, there is no question that the illegal search of Clark by St. Onge led directly to the alleged discovery of cocaine in Clark's pocket and the later stop, search, and arrest of Clark at the vehicle in which he was riding, literally within minutes of his release on the first arrest based on the illegal seizure of the suspected cocaine from his coat pocket approximately four hours earlier. Immediately after placing Clark under arrest in front of 275 Genesee Street, St. Onge specifically directed the police to place continuous surveillance on Clark's vehicle with the intention of either pulling the vehicle over when Clark later retrieved it, or of impounding the vehicle after 2 a.m. when it became illegal, pursuant to a city ordinance, to park on city streets. Further, St. Onge stated that his sole purpose for conducting such an inventory search was to find narcotics. Pursuant to this investigatory directive, Clark's vehicle, along with the Chevrolet in which Clark was a passenger, was stopped, as Officer Livergood stated, for the purpose of discovering illegal drugs, and the alleged cocaine was discovered as a result of the stop of the Chevrolet. While the Government suggests that, as Clark was already under investigation, the stop of the vehicle was independent of the search at 275 Genesee Street, the court notes that St. Onge clearly testified that, in an ongoing narcotics investigation, it is Niagara County law enforcement policy to arrange two controlled buys prior to making any arrests. One controlled buy from Clark had allegedly been made between March 1, 1992 and March 4, 1992, but no second controlled buy attempt had taken place nor had any been arranged at the time of the instant search and seizure on March 4, 1992. It

appears obvious to the court that the heightened investigation of Clark following his arrest by St. Onge was the direct consequence of the illegal search of him on the evening of March 4, 1992. Indeed, it is clear from the record that the subsequent surveillance concentrating on Clark and his vehicle that night had little to do with the prior controlled buy from Clark, but, rather, his arrest earlier that evening was an opportunity intended to be exploited by the Lockport Police Department in conducting further warrantless searches of Clark's person and automobile for the purpose of uncovering additional suspected narcotics. · While the identity of the male person who entered Clark's Renault after his release was not stated, the evidence fairly supports the conclusion that Officer Livergood's decision to pursue the Chevrolet must have been based on the suspicion, if not knowledge, that it was Clark. As he testified, in response to the question as to whether, had Clark not been arrested at 8 p.m. on the first narcotics possession charge, St. Onge would have initiated the intensive surveillance which led to the second arrest, cocaine discovery, and statements, St. Onge candidly replied, "I probably wouldn't, no." (T.I. 80). On this record, the court finds that St. Onge intended to exploit the initial illegal search and arrest of Clark in an attempt to short-cut his investigation.

The Government's assertion that, as Clark was already a suspect, the subsequent stop, search, and interrogation were independent of the illegal search is unsupported by the testimony of its own witnesses. Rather, the testimony makes clear that, prior to his arrest, there was no plan to focus special police investigative attention or resources on Clark's activities that day or at any other time. To suggest otherwise is contrary to what is contained in the record.

Examining the factors relevant in an analysis of whether the taint of the illegal search was sufficiently diminished to avoid applying the doctrine, the court finds that the time frame between the time of the illegal search and the subsequent vehicle stop, *i.e.,* approximately four hours, was limited, especially considering that Clark was in custody during most of that time. In *Taylor v. Alabama,*

457 U.S. 687, 691, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982), in concluding that the illegality of an arrest was not cured by the fact that six hours had elapsed between the time of arrest and confession where the defendant was in custody during that time period, the Court held that *Miranda* warnings do not necessarily cure an antecedent Fourth Amendment violation. In this case, there were no intervening circumstances, such as Clark consenting to a subsequent search or making voluntary statements at the station house after his first arrest, or further criminal activity by Clark, leading to the subsequent investigative activities directed against him. Indeed, it is clear that the second warrantless arrest of Clark was also illegal as, since there was no evidence to connect him with the cocaine discovered under the car, (T.II. 162–163), there was no probable cause to effect the arrest. See, *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989) (there is no probable cause to arrest unless the officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution" to believe that an offense has been committed by the person to be arrested). Finally, the court has already found above that St. Onge's search of Clark in front of 275 Genesee Street was patently illegal and was made solely for an impermissible purpose.

■ Given these factors, it cannot be concluded that the subsequent stop of Clark and the vehicles, minutes after his release on bail, was unrelated to the initial illegal search or that the effects of the initial illegal search upon the subsequent investigation had been otherwise attenuated. There are, moreover, no alleviating circumstances which may fairly be said to eliminate the taint of the illegal search as relating to the justification of the officers' activities following Clark's release from jail. Where the intention of the police engaged in the illegality is for the purpose of discovering evidence, the exploitation of the illegality is more manifest, and the extent of any arguably attenuating circumstances which may operate to avoid application of the doctrine must necessarily be greater. See, *United States v. Ceccolini, supra,* 435 U.S. at 279–80, 98 S.Ct. at 1061–62; *United States v. Oguns, supra,* at 447. A fair interpretation of the facts persuasively demonstrates that all of the activity directed toward Clark following the illegal seizure and his arrest by St. Onge was an intentional exploitation of that initial illegality, conceived and explicitly directed by St. Onge.

There are no sufficient attenuating circumstances which would sensibly justify a different conclusion. Admittedly, *Miranda* warnings were given during Clark's ride to headquarters, however, he was held in custody for approximately three and one-half hours before his release into the net of concentrated surveillance that, accordingly to St. Onge himself, would not have been initiated except for the arrest after the initial cocaine seizure. Accordingly, under the fruit of the poisonous tree doctrine which clearly applies to this case, the cocaine discovered under the vehicle following its stop by police must be suppressed.

■ The incriminatory statements subsequently made at the police station constitute "tainted fruit" of the initial illegality and should also be suppressed. *Oregon v. Elstad,* 470 U.S. 298, 308, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985), held that *Miranda* does not require that fruits of otherwise voluntary statements be discarded as inherently tainted simply because of a procedural failure to administer the required warnings unaccompanied by any actual coercion which so taints the investigatory process that a subsequent voluntary waiver is ineffective. However, the Court made clear that a procedural *Miranda* violation differs from violations of the Fourth Amendment which have traditionally mandated a broad application of the "fruit of the poisonous tree" doctrine. *Elstad, supra,* at 306, 105 S.Ct. at 1291. In this case, Clark was given his *Miranda* warnings at the police station, and subsequently, despite asking for an attorney, made incriminatory statements. Clark, however, would not have been at the police station but for the fact that St. Onge had initially arrested him after the illegal search, and intensively surveilled him following his release from jail solely because of the illegal search. Additionally, within minutes of his release, Clark and two innocent female companions were arrested and taken into custody based upon a packet which was discovered underneath the 1980

Chevrolet, not directly connected to Clark, and suspected of containing drugs, although not tested prior to Clark's second arrest.

While Clark was again read his *Miranda* rights during the brief return to headquarters, the police had also decided to arrest his companions, although they were not charged with narcotics violations. It is clear that the women's arrest for vehicle and traffic violations was pretextual. Neither Officer Jurasz, who stopped the Renault, nor Livergood, who stopped the Chevrolet, observed narcotics activity relating to the vehicles nor had they been advised the vehicles contained contraband. This is clear from the fact that Clark only admitted the Renault may have contained narcotics after the vehicles had been stopped, and after he had been taken to the police station following his second arrest.[11] The record thus fairly supports a finding that the primary reason for the presence of his companions at police headquarters was to encourage Clark to give a statement, thereby vitiating any attenuating effect of the *Miranda* warnings. Indeed, it was apparent to the police that Clark's initial interest in cooperating and apparent willingness to give a statement was for the purpose of removing suspicion from the two women companions who had been taken into custody with Clark. (T.II. 153).

Based on these facts, the court finds that while the presence of the women companions and his concern for them does not render involuntary Clark's otherwise voluntary statements, they should nevertheless be suppressed as "fruit of the poisonous tree" as they were not made because of any simple procedural violations, but, rather, were the direct product of an initial breach of his Fourth Amendment rights. See, *Wong Sun, supra,* 371 U.S. at 486 n. 12, 83 S.Ct. at 417 n. 12 (court suppressed defendant's statements, citing cases where voluntary acts of a defendant were held insufficient to cure otherwise unlawful acquisitions of evidence); *United States v. Carter,* 884 F.2d 368 (8th Cir.1989) (court suppressed evidence where voluntary confession was a direct result of an illegal search of defendant's wallet, despite

fact that *Miranda* warnings were given prior to the confession); *United States v. Lewis,* 760 F.Supp. 997, 1003 n. 11 (E.D.N.Y.1990) (court noted that "[i]f [a] search was undertaken for the express purpose of obtaining tangible evidence to be used in providing a confession, then clearly the confession should be suppressed").

Alternatively, even if the District Judge should find that the stop and second arrest of Clark were sufficiently attenuated from the illegal search in front of 275 Genesee to justify not applying the exclusionary rule to the cocaine found underneath the vehicle or to the statements made in the police station following the second arrest, the court finds that this evidence should be suppressed as the fruits of the illegal stop of the vehicle in which Clark was a passenger.

The court determined in Section 3 of this Report and Recommendation that the stop of the 1980 Chevrolet in which Clark was riding was pretextual and was made for the sole purpose of executing a warrantless search of the vehicle to find drugs. Solely because of this pretextual stop, Clark was searched and arrested for a second time on narcotics charges, based on Officer Livergood's discovery of what he suspected to be cocaine found underneath the vehicle, with Clark's two companions being arrested for vehicle and traffic violations rather than being issued routine summonses at the scene. For the same reasons as discussed above, the court can find no attenuating factors between the time of the illegal stop of the vehicle and the subsequent discovery of the cocaine beneath the car and the statements made thereafter at the police station, to justify not applying the exclusionary rule to this evidence. Officer Livergood testified frankly that during the brief interval after the vehicle was stopped and he requested and received valid registration and licensing documents, (T.II. 148), he twice inspected the area near and under the vehicle for narcotics. (T. 149). Therefore, the physical evidence and statements discovered as a result of the illegal

---

**11.** These factors distinguish this case from those cases where a careful and detailed timely surveillance connected a vehicle or driver or passenger to suspected on-going narcotics trafficking, thereby justifying a stop of the vehicle. See, *e.g., United States v. Cook,* 1991 WL 190564 (S.D.N.Y. 1991).

stop should also be suppressed on this alternative basis.

In sum, unless the narcotics illegally seized from Clark outside of 275 Genesee Street, the narcotics discovered as a result of the later vehicle stop, and the statements obtained following his second arrest are suppressed, the prosecution will, in fact, be placed "in a better position than it would have been if no illegality had transpired." *Nix v. Williams,* supra, 467 U.S. at 443, 104 S.Ct. at 2508. Further, as the primary taint of the first illegal search was fully and intentionally exploited by the police, the "prosecution is not put in a worse position simply because of some earlier police error or misconduct." *Id.* Applying the exclusionary rule to the targeted evidence in this case will have the effect of deterring similar future violations and preserving the integrity of the federal judicial process without unreasonably burdening competent police investigative activity. Had the police followed their own policies, the investigation of Clark's suspected narcotics activity could have proceeded, and valid search warrants and an arrest warrant may eventually been issued. Instead, fundamental and well established Fourth Amendment protections were flagrantly disregarded, resulting in the cascade of constitutional violations revealed in this record amply supporting this conclusion.

## 5. *Abandonment*

Although the court has already recommended suppression of the evidence and statements in this case based upon the above discussion, making this next issue moot, as this is a Report and Recommendation to the District Judge, the court will discuss this argument as an alternative analysis and basis to suppress the cocaine discovered under the Chevrolet following the traffic stop.

Clark also seeks to suppress as evidence cocaine found underneath the Chevrolet. In his argument, Clark has not established any legitimate expectation of privacy in the area of a public roadway underneath the vehicle. In fact, the Government argues that Clark abandoned any claim he may have had in the narcotics discovered beneath the car. The Government (although no evidence adduced at the suppression hearing speaks to this point) asserts that Clark abandoned the co-

caine by throwing it out of the car prior to re-entering the Chevrolet at Officer Livergood's direction. The Government states that, under these circumstances, *i.e.,* the suggestion that Clark placed the cocaine under the car, Clark has no Fourth Amendment protection claim relating to the cocaine's seizure. It should be noted that the Government's argument is weakened because of the absence of direct evidence to establish that Clark ever had possession of the allegedly discarded cocaine, as Officer Livergood stated at the hearing that he never saw Clark throw anything out of the vehicle. (T.II. 169).

 *United States v. Lee,* 916 F.2d 814 (2d Cir.1990), held that Fourth Amendment protection does not extend to abandoned property. "When a person voluntarily abandons property ... he forfeits any reasonable expectation of privacy that he might have had in the property." *Lee, supra,* at 818. The determination as to whether property is abandoned is necessarily factual, with the intent of the person who is purported to have abandoned the property an essential factor. See, *United States v. Moskowitz,* 883 F.2d 1142, 1147 (2d Cir.1989). Intent may be inferred from words spoken, acts done, and other objective facts. See, *Lee, supra,* at 818. Additionally, while an abandonment must be voluntary, "the existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." See, *United States v. Morgan,* 936 F.2d 1561 (10th Cir.1991) (quoting, *United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir.1983)). See also, *United States v. Koessel,* 706 F.2d 271 (8th Cir.1983) (where drug enforcement agents approached defendant in his car and defendant opened door and threw down packet later found to contain cocaine, the court held that the defendant had abandoned the property and had no Fourth Amendment interest in the packet).

In this case, when the Chevrolet was pulled over by Officer Livergood, Clark initially stepped out of the vehicle, but got back in the car when directed to by Livergood. When Officer Livergood approached the car the second time, after ascertaining the validi-

ty of the registration, he discovered the alleged cocaine on the ground beneath the car. (T.II. 149). At that point, he reached into the car, grabbed Clark, and told him he was under arrest. (T.II. 150). However, no words were spoken as to the ownership of the cocaine found under the car, and Livergood did not interrogate Clark at all during the ride to the police station. (T.II. 152). Livergood did state that he did not see Clark throw anything from the vehicle, (T.II. 169), however he also noted that his view of Clark was blocked by the vehicle itself. (T.II. 183). The only statements regarding the cocaine were made at the police station to St. Onge when Clark accused him of taking money from his car, the Renault, when Clark also stated that there had been cocaine in the car along with the money which had not been taken. (T.I. 68).

 Under these facts, Clark has not directly asserted any ownership interest or any expectation of privacy in the package of alleged narcotics found under the Chevrolet auto, and, therefore, under the theory of abandonment, would not be able to assert a Fourth Amendment privilege as to the package. See, *Moskowitz, supra,* at 1148 (where defendant's own version of the facts did not assert or acknowledge any ownership or control over the evidence sought to be suppressed, the court did not find any reasonable expectation of privacy and held the evidence to have been abandoned).[12] Even assuming the Government can show at trial a physical nexus between the cocaine and Clark prior to its discovery under the car, nevertheless, it was discovered beneath the vehicle, thereby justifying the factual conclusion that is was abandoned. However, the court's analysis of abandonment cannot end here.

In *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that, where the defendant was being chased by police concededly

without probable cause or any reasonable suspicion of wrongdoing and, prior to being seized or arrested, the defendant threw away a "rock" later found to be crack cocaine, thereby abandoning the drugs, the cocaine could not be suppressed as fruit of an illegal seizure as the defendant *had not yet been seized at the time of the alleged abandonment.* In the instant case, however; Clark had been illegally seized within the meaning of the Fourth Amendment, *i.e.,* made subject to an illegal traffic stop constituting a seizure, prior to the time that the suspected cocaine was, as suggested by the Government, allegedly removed from the Chevrolet. Under the reasoning of *Hodari D.,* therefore, the cocaine discovered as a result of the illegal traffic stop of the Chevrolet should be suppressed as fruit of the illegal seizure. See, *United States v. Wilson,* 953 F.2d 116, 127 (4th Cir.1991) (court, in suppressing evidence where search of defendant's coat was result of an illegal seizure, stated that "unlike the situation in *Hodari D.,* the purported abandonment of the coat by [defendant] occurred after he had been illegally seized ... defendant's actions were clearly the result of the illegal seizure, and it follows that the recovered drugs were the fruit of the illegality and must be suppressed"). See also, *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) (agents retrieved contraband abandoned by defendants while being pursued without proper warrant—contraband deemed abandoned and not subject to exclusionary rule) (Holmes, J.); *United States v. Coggins,* 986 F.2d 651 (3d Cir.1993) (while upholding conviction on other grounds, court noted that the defendant was effectively seized at airport where he yielded to agent's authority by sitting down for questioning, and that defendant's later action of running away and throwing bags of cocaine into outside bushes did not constitute an abandonment which would cure the taint of

---

**12.** Although this court has concluded that Clark would not have standing to challenge the search in and around the automobile in which he was riding, this finding is not contrary to the court's conclusion above that the physical evidence and statements be suppressed as fruit of the poisonous tree, as a defendant can prevail on a "fruit of the poisonous tree" claim if he has standing regarding the violation which constitutes the poi-

sonous tree. See, *United States v. Sanchez,* 719 F.Supp. 128, 133 (E.D.N.Y.1989), aff'd, 902 F.2d 1556 (2d Cir.1990); 4 W. LaFave, Search and Seizure, § 11.4 at 371 (2d ed. 1987). There is no dispute that Clark has standing to challenge the illegal warrantless seizure from his person and his illegal warrantless arrests. The court has also concluded, *supra,* that Clark has standing to challenge the pretext stop of the automobile.

an illegal seizure—where abandonment of property is precipitated by an unlawful seizure, the property must be excluded as fruit of the poisonous tree). Accordingly, the Government's argument that Clark abandoned the package of cocaine and that the cocaine is therefore not subject to suppression should fail.

### 6. Statements in the Police Station after the Second Arrest

This issue is also moot because of my recommendation as stated above, however, I will, alternatively, address the issue in the interest of completeness of this Report and Recommendation should the District Judge not accept my conclusions as to the application of the fruit of the poisonous tree doctrine discussed under Section 4 above.

Clark argues that the statements made in the police station, subsequent to his second arrest in the early morning of March 5, 1992, were obtained in violation of his Fifth Amendment rights as the statements were made after he had been given his *Miranda* warnings, and had asserted his right to counsel. The Government contends that, as Clark had given a voluntary oral statement at the police station after being read his *Miranda* warnings twice by Officer Livergood, and did not assert his right to counsel until he was asked to make a formal written statement to supplement his oral statement, the oral statement is fully admissible as it was made before any right to counsel was asserted.[13] As to the later statements made to Detective St. Onge, the Government argues that these statements were initiated by Clark, not by St. Onge, and that they are, therefore, also admissible. Clark, however, claims that the fact that he refused to give a formal written statement until he consulted with counsel establishes that he did not understand the *Miranda* rights as given, or, alternatively, that he never effectively waived his *Miranda* rights.

▆▆ Before a custodial interrogation, a defendant must be informed of his right to remain silent and his right to the presence of an attorney prior to questioning, regardless of his ability to afford one. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). These rights may be waived if the waiver is knowing, intelligent, and voluntary, but if a defendant requests counsel, all interrogation must cease until an attorney is present. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Questioning may not be resumed without an attorney unless the defendant "(a) initiate[s] further discussions with the police, and (b) knowingly and intelligently waive[s] the right he had invoked." *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984); *United States v. Spencer,* 955 F.2d 814, 818–19 (2d Cir.1992). If a defendant's request for counsel is unambiguous or equivocal, questions limited to clarifying the request are permitted. *United States v. Gotay,* 844 F.2d 971, 975 (2d Cir.1988).

In this case, upon Clark's arrival at the police station for the second time that evening with Officer Livergood, Clark was taken to the platoon leader's room for the purpose of giving a statement which Clark had indicated he was willing to provide. (T.II. 153). Clark had indicated that he wished to make a statement so that his two female companions, who were also taken into custody for vehicle and traffic violations, would not be involved in the narcotics charges brought against Clark. (T.II. 153). Before making any statement, Clark was readvised of his *Miranda* rights by Officer Livergood. (T.I. 113). Clark then made an oral statement to the effect that he was missing $2500 in cash from his vehicle, and that the police had taken the money because, if one of his friends had taken the money, they would have also taken the drugs that were in the car. (T.II. 155). The police reduced this statement to written form. (T.II. 155). After making this statement, Clark said he would give a formal written statement, but, upon reading the waiver paper with the *Miranda* warnings imprinted on it, he changed his mind and requested counsel. (T.II. 156). Questioning at that point ceased, and Clark

---

13. Clark has not challenged his statements on the grounds of voluntariness and the court notes that, using the general factors set forth to establish voluntariness, (see, *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991)), there is no indication that Clark's statements were involuntary.

was taken to the booking room for processing. (T.II. 156).

In *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the defendant acknowledged his *Miranda* rights and refused to give a written statement without his attorney present, but agreed to give an oral statement to the police. The Court held that it was not a violation of the defendant's *Miranda* rights to take an oral confession where the defendant gave an uncoerced statement. The Court found that the defendant's distinction between oral and written statements did not indicate that the defendant did not understand his *Miranda* rights, and that, therefore, his request for counsel before giving a written statement was not effective for all purposes, *i.e.*, the giving of an oral statement. *Barrett, supra*, at 832. The defendant's ignorance of the full consequences of his decision to give the oral statement did not invalidate his voluntary decision to waive his rights as to the oral statement. *Barrett, supra*, at 832 (citing, *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1296 (1985)).

■ In this case, Clark gave his oral statement after being fully admonished of his *Miranda* rights in the police car. The time period between the arrest and the statement was relatively brief, as the police station was not far away. (T.II. 152). Upon arrival at the police station, Clark was again given his *Miranda* warnings by Officer Livergood, and indicated that he fully understood his rights before he gave the oral statement. (T.I. 114). Clark cannot now argue that he did not understand his rights or that he did not waive his rights as to his oral statement when he gave the voluntary statement for the express purpose of exonerating his female companions. See, *e.g., United States v. Taft*, 769 F.Supp. 1295, 1304 (D.Vt.1991) (court held statements made prior to the assertion of the right to counsel to be admissible and not subject to suppression). The evidence at the hearing provides no indication that only after reading the printed waiver form did Clark fully appreciate the implication of his earlier statements. Rather, it appears that Clark simply changed his mind. Although the court noted in its discussion in Section 4 above that the taking of the two women companions into custody on pretextu-

al traffic violations was intended to encourage Clark into making a statement, this finding demonstrates the intention of the police to deliberately exploit the illegal vehicle stops and does not in itself render the statements involuntary.

Clark also contends that St. Onge attempted to elicit statements from him after Clark had indicated that he wished to speak to counsel, and that those incriminatory statements should be suppressed. The Government claims that the statements which Clark made in St. Onge's presence were made spontaneously and without prompting, and are, therefore, not subject to suppression.

■ In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), a discussion in a police vehicle in which the defendant was riding after being arrested as to the possibility that school children might find a gun which the defendant had allegedly discarded, prompted the defendant to make a statement as to the location of the gun and to lead the police to the area where the gun was subsequently found. The Court held that the defendant's incriminatory statement as to the gun should not be suppressed as, based on the record, there was no way that the police should have known that a few off-hand remarks would have initiated a response from the defendant. The Court stated that, besides police questioning for the purpose of exacting express replies, interrogation also refers to words or actions on the part of the police which the police should know are reasonably likely to elicit an incriminating response from a defendant. *Innis, supra*, at 301–302, 100 S.Ct. at 1689–1690. However, it is not enough to find that "subtle coercion" used by the police is the equivalent of interrogation. It must also be established that the defendant's response was the product of words or actions by the police that the police should have known were likely to elicit the incriminatory response so as to be treated as the functional equivalent of an interrogation. *Innis, supra*, at 301–302, 100 S.Ct. at 1689–1690.

■ In this case, Detective St. Onge went to the police station following Clark's second arrest, and presumably after being advised of Clark's earlier inculpatory statement regard-

ing the presence of narcotics in his Renault, upon entering a room, came "face to face with the Defendant." (T.I. 68). Clark made a comment about St. Onge having been the one to break the window in his car, to which St. Onge replied that, "I suppose you're going to say I planted that crack there, too." (T.II. 68). Clark responded, "no, no, that was there. I'm talking about my $2500, you took my $2500." (T.II. 68). St. Onge was aware at the time of this exchange that Clark had invoked his right to counsel. (T.I. 125).

In *Jenkins v. Bara*, 663 F.Supp. 891 (E.D.N.Y.1987), while a defendant was seated in the police station following his arrest and after invoking his right to counsel, a police officer increased the volume of the police radio which was broadcasting information regarding the burglary for which the defendant had just been arrested, and in particular, details concerning the discovery of a suspicious automobile in the vicinity of the burglary, and, after allowing the defendant to hear the broadcast, leaned over to the defendant and stated, "I think they found your car." *Jenkins, supra*, at 896. An incriminatory statement from the defendant followed. The court refused to suppress the statement where there was no evidence of trickery on record, holding that, even though the officer's comment was made in order to "bait" the defendant, it was not designed to elicit an incriminatory response. *Jenkins, supra*, at 896. Similarly, in this case, St. Onge's statement to Clark, while certainly the product of personal animosity between the two men, does not appear to this court to have been made with the intention of eliciting an incriminatory response from Clark. In fact, in response to St. Onge's statement, Clark could have also just as easily made an exculpatory statement, stating that the cocaine was not his. St. Onge's retort is also understandable as Clark had earlier accused him of planting the packet of cocaine during the initial search of Clark earlier that evening.

Based on the record, it cannot be held that St. Onge should have known that his statement was reasonably likely to elicit an incriminatory response, and, if the statements are not suppressed based upon the application of the "fruit of the poisonous tree" doctrine as discussed and recommended above, Clark's statement to St. Onge should not be suppressed on this basis. See also, *United States v. Collins*, 462 F.2d 792, 797 (2d Cir. 1972), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972) (agents request that defendant confess to prevent "more killings, more bloodshed, and more bank robberies" was no more than an exhortation that defendant reconsider his decision not to talk). *Cf. United States v. Brown*, 720 F.2d 1059 (9th Cir.1984) (where officer baited defendant to obtain an incriminatory response by screaming at defendant, accusing defendant of selling drugs, and asking defendant explicitly "you got any dope?", incriminatory statements yelled by defendant in response were held inadmissible).

## CONCLUSION

Based on the discussion above, Defendant Clark's motion to suppress statements and physical evidence should be GRANTED. Additionally, as noted above, in Sections 5 and 6 of this Report and Recommendation, the court has also analyzed Clark's other claims as to his suppression motion, however, such analysis is only for the purpose of providing the district court with this court's discussion of these issues should the district court not agree with this court's ultimate conclusion that the evidence subject to the motion should be suppressed.

DATED: March 24, 1993

Buffalo, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and*

*Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.